461 F.3d 461
 Olivia RUX, individually and as next friend for I.M.O., a minor; Jamie Owens, individually and as next friend for I.M.O., a minor; Sharla Costelow, individually and as next friend for E.C. and B.C., minors; Novella Wiggins, individually and as next friend for J.R.M., Jr., a minor; Lorrie D. Triplett, individually and as next friend for Andrea Triplett and Savannah Triplett; Jennifer Clodfelter, individually and as next friend for Noah Clodfelter; Kenyon Embry, individually and as next friend for Capri Dumar; Ronald W. Francis; Jacqueline Saunders, individually and as next friend for I.S. and J.S., minors; Sandra Francis; Rogelo Santiago; Simeona Santiago; Sarah Guana Esquivel; Jesse Nieto; Thomas Wibberly; Patricia Wibberly; Theodis Triplett; Wayne Triplett; Reed Triplett; Gary Swenchonis, Sr.; Deborah Swenchonis;
Shalala Swenchonis; Kate Brown; Sean Walsh; Kevin Roy; Lou Gunn; Mona Gunn; Jamal Gunn; Jason Gunn; Anton J. Gunn; Leroy Parlett; Etta Parlett, individually and as next friend for H.P., a minor; Kera Miller; Matthew Parlett; John Clodfelter; Gloria Clodfelter; Joseph Clodfelter; Toni Wibberly; Diane McDaniels; Teresa Smith; George Costelow; Dorothy Costelow; Frederica McDaniels-Bess, Plaintiffs-Appellees,
v.
REPUBLIC OF SUDAN, Defendant-Appellant.
 No. 05-2003.
 United States Court of Appeals, Fourth Circuit.
 Argued: May 24, 2006.
 Decided: September 1, 2006.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED ARGUED: Douglas Knox Bemis, Jr., Hunton & Williams, Washington, D.C., for Appellant. Andrew C. Hall, Hall, Joseph & Lamb, P.A., Miami, Florida, for Appellees. ON BRIEF: Gregory N. Stillman, Carl D. Gray, Hunton & Williams, Norfolk, Virginia; Thomas R. Snider, Hunton & Williams, Washington, D.C., for Appellant. Mary Jane Hall, Kaufman & Canoles, P.A., Norfolk, Virginia; James Cooper-Hill, Rockport, Texas; Nelson M. Jones, Nicholas & Jones, L.L.P., Houston, Texas; Alan W. Young, Portola Valley, California, for Appellees.
 Before WIDENER and DUNCAN, Circuit Judges, and HENRY F. FLOYD, United States District Judge for the District of South Carolina, sitting by designation.
 Affirmed in part and dismissed in part by published opinion. Judge DUNCAN wrote the opinion, in which Judge WIDENER and Judge FlOYD joined.
 OPINION
 DUNCAN, Circuit Judge:
 
 
 1
 In this action for damages brought against it by relatives of American sailors killed in the terrorist bombing of the U.S.S. Cole ("Plaintiffs"), the Republic of Sudan ("Sudan") appeals an order of the district court largely denying its motion to dismiss. On appeal, Sudan argues both that the district court erred in denying its motion to dismiss for lack of subject matter jurisdiction and also that this court should exercise pendent appellate jurisdiction over, and reverse, the district court's denial of its motion to dismiss for lack of personal jurisdiction and improper venue. Sudan also argues that this court should exercise pendent appellate jurisdiction over and consider for the first time its motion to dismiss for lack of standing, an issue on which the district court deferred action. Because we find that the district court's exercise of subject matter jurisdiction was proper and that there is no basis to exercise pendent appellate jurisdiction over the remaining issues, we affirm the district court's denial of Sudan's motion to dismiss for lack of subject matter jurisdiction and dismiss the remainder of Sudan's appeal.
 
 I.
 
 2
 This case arises out of the October 12, 2000, bombing of the U.S.S. Cole in which seventeen American sailors were killed. The bombing, alleged in the Amended Complaint to have been planned and executed by the terrorist organization Al-Qaeda, occurred while the ship was berthed in Aden Harbor in Yemen. Plaintiffs, consisting of more than fifty surviving family members of the sailors who were killed, brought this action to recover for damages resulting from their deaths.
 
 
 3
 The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C.A. §§ 1602-1611 (West 1994 & Supp.2006), generally immunizes foreign states such as Sudan from suit in federal court. See § 1604. Section 1605(a)(7) of FSIA, however, provides an exception for suits against state sponsors of terrorism for damages arising from certain terrorist acts identified in the statute. § 1605(a)(7). Plaintiffs invoked § 1605(a)(7) based on allegations that Sudan had provided various forms of support to Al-Qaeda both during the years preceding and in the orchestration of the bombing of the U.S.S. Cole.
 
 
 4
 Plaintiffs filed their original complaint on July 16, 2004, and subsequently amended it several times. They effected service of process on Sudan on December 16, 2004. When Sudan failed to answer within the prescribed time, the Clerk of Court entered default against it. Plaintiffs then moved for default judgment, which the district court scheduled for hearing. Before the date of the hearing, Sudan filed a Motion to Vacate Entry of Default and Cancel Evidentiary Hearing. In that motion, Sudan argued that the district court lacked personal jurisdiction because of insufficient process and service of process. Following a hearing on Sudan's motion, the district court vacated the entry of default with Plaintiffs' consent but held that Sudan had waived its right to contest personal jurisdiction and that Plaintiffs had effected proper service on Sudan.
 
 
 5
 On August 3, 2005, Sudan filed its Motion to Dismiss Plaintiffs' Amended Complaint with Prejudice. In that motion, Sudan argued (1) that the court lacked subject matter jurisdiction under FSIA because Plaintiffs failed to plead sufficient jurisdictional facts; (2) that Sudan lacked sufficient minimum contacts with Virginia to support personal jurisdiction; (3) that venue was improper in the Eastern District of Virginia; (4) that Plaintiffs' process was insufficient; (5) that Plaintiffs' service of process was insufficient; and (6) that Plaintiffs had failed to state a claim on which relief could be granted for various reasons, including lack of standing.
 
 
 6
 On August 26, 2005, the district court entered the order, which is at issue in this appeal, denying most of Sudan's motion to dismiss. In that order, the district court held: (1) that Plaintiffs had pleaded sufficient facts to support subject matter jurisdiction under § 1605(a)(7); (2) that Sudan had waived its right to contest personal jurisdiction, service of process, and venue; (3) that Plaintiffs had nevertheless effected proper service of process on Sudan; (4) that the district court had personal jurisdiction over Sudan; and (5) that the Eastern District of Virginia was a proper venue for the suit. The district court took under advisement Sudan's motion to dismiss for failure to state a claim until after Sudan filed an answer. In so doing, the district court specifically deferred ruling on Sudan's argument that Plaintiffs lacked standing. Sudan timely appealed.
 
 
 7
 In this appeal, Sudan argues that the district court erred in denying its motion to dismiss for lack of subject matter jurisdiction under FSIA, an issue that is subject to interlocutory review. Sudan also asks us to exercise pendent appellate jurisdiction to review the district court's rulings on the issues of personal jurisdiction and venue. Sudan finally asks us to exercise pendent appellate jurisdiction over and decide the issue of standing, even though the district court has not yet ruled on it. We consider each of Sudan's arguments in turn.
 
 II.
 
 8
 We first address Sudan's argument that Plaintiffs failed to allege sufficient facts in the Amended Complaint to establish subject matter jurisdiction under FSIA.[1] "The existence of subject matter jurisdiction under [FSIA] ... is a question of law" that we review de novo. Eckert Int'l, Inc. v. Gov't of the Sovereign Democratic Republic of Fiji, 32 F.3d 77, 79 (4th Cir.1994). For reasons that follow, we reject Sudan's argument.
 
 
 9
 FSIA provides that, subject to certain limited exceptions, "a foreign state shall be immune from the jurisdiction of the courts of the United States." § 1604. One exception to such immunity arises in claims against a foreign state for injuries resulting from certain acts of terrorism. See § 1605(a)(7).[2] Under § 1605(a)(7), "victims of terrorism [can] sue countries that have been designated state sponsors of terrorism by the State Department ... for those countries' provision of `material support' for terrorist acts." Hegna v. Islamic Republic of Iran, 376 F.3d 226, 230 (4th Cir.2004) (citing § 1605(a)(7)). This so-called "terrorist exception" has the following jurisdictional requirements: (1) the provision of material support by a state sponsor of terrorism; (2) the provision of such support by an official of the state "while acting within the scope of his or her office, employment, or agency"; and (3) a causal link between the material support and damage resulting from an act of terrorism. See § 1605(a)(7).
 
 
 10
 A foreign state's challenge[3] to subject matter jurisdiction in an action brought pursuant to the terrorist exception to FSIA may be based on either (1) the inadequacy of the pleadings as a matter of law; or (2) a denial of the allegations in the complaint. Phoenix Consulting, Inc., 216 F.3d at 40. In the first instance, the foreign state does not challenge the plaintiff's allegations of fact; in the second, the district court must resolve the factual dispute in ruling on the motion to dismiss. Id. Sudan's motion to dismiss here was based solely on the legal sufficiency of the pleadings. In other words, this appeal presents no contested issues of fact and we accept Plaintiffs' allegations as true for purposes of determining jurisdictional sufficiency. See Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 93 (D.C.Cir.2002); Foremost-McKesson, Inc. v. Islamic Republic of Iran, 905 F.2d 438, 440 n. 3 (D.C.Cir.1990).
 
 
 11
 The standard we apply in assessing Sudan's challenge "is similar to that of Rule 12(b)(6), under which dismissal is warranted if no plausible inferences can be drawn from the facts alleged that, if proven, would provide grounds for relief." Price, 294 F.3d at 93. Plaintiffs need not set out every fact on which jurisdiction under § 1605(a)(7) depends. Id. Rather, they must include sufficient facts to support a reasonable inference that their claims satisfy the terrorist exception and, therefore, that an exercise of subject matter jurisdiction is appropriate. Owens, 412 F.Supp.2d at 106; see Price, 294 F.3d at 93-94.
 
 
 12
 The Amended Complaint broadly alleges that Sudan "provided material support in the form of funding, direction, training and cover to Al-Qaeda, a worldwide terrorist organization whose operatives facilitated the planning and execution of the bombing of the U.S.S. Cole." Am. Compl. at 2. More specifically, the Amended Complaint contains the following jurisdictional allegations:
 
 
 13
 26. Defendant Republic of Sudan, by and through officials, employees or agents acting knowingly and willfully, used funds and other assets belonging to the Republic of the Sudan to provide material support and resources to Osama bin Ladin and to Al Qaeda, the perpetrators of the bombing of the U.S.S. Cole referenced herein above on October 12, 2000 in port in Yemen, which bombing resulted in the wrongful deaths of the plaintiffs' decedents. The provision of material support or resources was engaged in by officials, employees and agents of the Republic of the Sudan while such officials, employees or agents were acting within the scope of their office, employment or agency.
 
 
 14
 27. The bombing of the U.S.S. Cole was an act of international terrorism knowingly and deliberately aided and abetted by Defendant Republic of the Sudan. The providing to Osama bin Ladin of safe harbor and shelter during a period of time up to and including 1996 and to other members of Al Qaeda through 2001, created liability, on the part of Defendant Republic of the Sudan. Defendant Republic of the Sudan provided material support and resources to some of the actual perpetrators of the bombing of the U.S.S. Cole. The Republic of Sudan aided and abetted the actual perpetrators in carrying out such acts of terrorism. Agents, servants or employees of the Republic of the Sudan knew that the acts of Osama bin Ladin were acts of terrorism designed to cause death or serious injury to the victims of its terrorism. Agents, servants or employees of the Republic of the Sudan participated in the providing of the shelter to Osama bin Ladin and to Al-Qaeda, the perpetrators of the acts complained of herein. Among the acts providing support or resources were the following: (a) the Gum Arabic Company, Ltd, a company operating in the Republic of Sudan was jointly owned by the government of Sudan and Osama bin Ladin; (b) use of a diplomatic pouch to send explosive materials belonging to Osama bin Ladin for Al Qaeda outside the Republic of Sudan; (c) the establishment of a bank primarily financed by Osama bin Ladin, the al-Shamal Islamic Bank in Khartoum, which bank is jointly owned by the Republic of the Sudan; (d) Omar Hassan Ahmad al Bashir, president of the Republic of Sudan, authorized the entry into the Republic of Sudan by Al Qaeda operatives and gave Al Qaeda special authority to avoid paying taxes and duties ordinarily due to the Republic of the Sudan; (e) Osama bin Ladin founded Wadi-al-Aqiq, a trading company which was allowed unrestricted shipping by the Sudanese government; (f) the Sudanese government allowed Osama bin Ladin and Al Qaeda to operate training camps within the Republic of Sudan for the purpose of training terrorists including training such people in how to manufacture bombs and explosives; (g) the Republic of Sudan failed to comply with UN Security Council Resolutions 1044, 1054 and 1096, which were passed in 1996, and as of April, 2000 continued to harbor various terrorist groups including but not limited to Al Qaeda; (h) the Sudanese government allowed Al Qaeda operative Jamal Ahmed al-Fadl to ship four crates of explosive from Sudan to Yemen, the site of the bombing of the USS Cole; (i) Defendant Republic of the Sudan ... sent its minister of foreign affairs, Mustafa Osman Ismail in May 2003 to the United States to issue a public apology for the prior harboring and assisting of terrorists including but not limited to Al Qaeda and Osama bin Ladin, which apology was aired on CSPAN ....
 
 
 15
 29. The attack on October 12, 2000 against the U.S.S. Cole while in a harbor in the waters of Yemen was part of a decade-long plan of international terrorism directed at the United States of America and its citizens that was conceived and implemented pursuant to an international conspiracy of terrorists, usually referred to as Al Qaeda, which conspiracy was joined and supported by Defendant Republic of the Sudan. Al Qaeda could not have existed or planned its acts of terrorism, including an act directed at an American Naval vessel, without the support of state sponsors of terrorism including Defendant Republic of the Sudan. Between 1991 and 1996 Defendant Republic of the Sudan provided shelter and a safe haven for the operations of Al Qaeda's leader, Osama bin Ladin. After 1996, Defendant continued to render support and shelter [to] other Al-Qaeda operatives including Yemeni militant terrorists who planned the attack on the U.S.S. Cole.
 
 
 16
 30. Commencing in 1991, Osama bin Ladin and his Al Qaeda organization were welcomed in the Republic of the Sudan by the leader of the National Islamic Front Haza al Turabi and the President of the Republic of the Sudan, Omar Bashir, who provided entry to and departure from the Republic of the Sudan for members of Al Qaeda without the normal customs inspections and payment of fees to which all other persons were subjected.
 
 
 17
 Id. ¶¶ 26, 27, 29, 30. Sudan argues that these allegations do not satisfy the three jurisdictional requirements of § 1605(a)(7) listed above. We therefore turn to a consideration of each.
 
 
 18
 A. The sufficiency of Plaintiffs' allegations of "material support or resources" by a state sponsor of terrorism[4]
 
 
 19
 Sudan argues that Plaintiffs' allegations of "material support or resources" under § 1605(a)(7) do not meet the statutory definition of that term. Under § 1605(a)(7),
 
 
 20
 the term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safe-houses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel ..., and transportation.
 
 
 21
 18 U.S.C.A. § 2339A(b)(1) (West Supp. 2006); see § 1605(a)(7) (incorporating the definition of "material support or resources" from 18 U.S.C. § 2339A(b)(1)). Plaintiffs may therefore satisfy the first requirement of § 1605(a)(7) by identifying conduct by Sudan that falls within the meaning of any one of these listed forms of material support. Because § 2339A(b)(1) does not define the forms of material support that are relevant in this case, we will construe each in accord with its ordinary or natural meaning. Smith v. United States, 508 U.S. 223, 228, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993). In doing so, however, we also bear in mind the need to interpret statutory language in a manner that effectuates congressional intent. See United Hosp. Ctr., Inc. v. Richardson, 757 F.2d 1445, 1453 (4th Cir.1985). With these principles in mind, we consider various forms of material support referenced in § 2339A(b)(1).
 
 
 22
 Sudan focused much of its argument on the parameters of the term "safehouses." As we have set forth above, Plaintiffs allege that Sudan provided Al-Qaeda safe haven and a base of operations from which to conduct its terrorist operations. Am. Compl. ¶27(a), (c), (d), (e), (f) (alleging that Sudan allowed entry of Al-Qaeda operatives into Sudan; provided financial support to Al-Qaeda in the form of joint business ventures and relief from taxes and duties; and allowed Al-Qaeda to operate terrorist training camps in Sudan). Sudan argues that these allegations are not sufficient to state material support under the "safehouses" provision because the term should be limited to discrete buildings or structures. We disagree.
 
 
 23
 The term "safehouse" is normally defined as a "place where one may engage in secret activities or take refuge." Webster's Ninth New Collegiate Dictionary 1036 (1986). While one could certainly read the type of spatial limitations that Sudan advocates into this definition, we discern nothing inherent in the normal meaning of the term that necessarily warrants those limitations. Rather, it is entirely consistent with this definition to construe the statutory term to include the making available of locations within a country that serve as a base of operations for terrorists.
 
 
 24
 The underlying purpose of § 1605(a)(7), which guides our analysis, supports the more expansive construction of the term. Congress adopted § 1605(a)(7) to "give American citizens an important economic and financial weapon against" state sponsors of terrorism by "allowing suits ... against countries responsible for terrorist acts where Americans ... suffer injury or death." H.R.Rep. No. 104-518, at 62 (1995) (Conf.Rep.). Congress based this expansion of jurisdiction on its recognition that state sponsors of terrorism "have become better at hiding their material support for their surrogates, which includes the provision of safe havens, funding, training, ... and the like." Id. Thus, the ordinary meaning of the term "safehouses" does not require, nor does the legislative history underlying the statute support, the restrictive interpretation of the term for which Sudan argues.
 
 
 25
 Moreover, the only other court to have construed comprehensively the scope of the term "safehouses" reached a similar conclusion. In rejecting a nearly identical argument by Sudan in an action for damages arising out of Al-Qaeda's 1998 bombings of the U.S. embassies in Kenya and Tanzania, the district court for the District of Columbia held that "[i]nsofar as the government of the Republic of Sudan affirmatively allowed and/or encouraged al-Qaeda and Hizbollah to operate their terrorist enterprises within its borders, and thus provided a base of operations for the planning and execution of terrorist attacks . . . Sudan provided a `safehouse' within the meaning of 18 U.S.C. § 2339A, as incorporated in 28 U.S.C. § 1605(a)(7)." Owens, 412 F.Supp.2d at 108. Similarly, here, allegations that Sudan provided Al-Qaeda with locations within the country where its members could meet, engage in business activities and operate terrorist training camps satisfy the "safehouses" provision of § 2339A(b)(1) for purposes of meeting the jurisdictional requirements of § 1605(a)(7).
 
 
 26
 In addition, Plaintiffs' allegations meet the "financial services" and "transportation" elements of the definition of material support as well. As explained above, we will construe each in accordance with its ordinary meaning. See Smith, 508 U.S. at 228, 113 S.Ct. 2050.
 
 
 27
 The term "financial services" normally means the function of providing a service relating to finance or financiers. Webster's Ninth New Collegiate Dictionary 463, 1076 (definitions of financial and service). Plaintiffs meet this definition by alleging that Sudan formed a trading company and a bank with Al-Qaeda, and that it granted members of Al-Qaeda special tax and customs allowances. Each of these actions on the part of Sudan provided services of a financial nature to Al-Qaeda. Am. Compl. ¶ 27(a), (c), (d).
 
 
 28
 The term "transportation" commonly means "an act, process, or instance" of conveying "passengers or goods" from one place to another. Webster's Ninth New Collegiate Dictionary 1254. Plaintiffs meet this definition by alleging that Sudan allowed Al-Qaeda to use its diplomatic pouch, authorized entry of members of Al-Qaeda into the country, allowed a company run by Osama bin Laden unrestricted shipping, and allowed a member of Al-Qaeda to ship explosives to Yemen. Am. Compl. ¶ 27(b), (d), (e) and (f). Each of these alleged actions involve Sudan's exercise of control over the movement of passengers or goods from one place to another.
 
 
 29
 At bottom, Plaintiffs' allegations meet numerous elements of the definition of material support set out in § 2339A(b)(1) and incorporated into § 1605(a)(7). We therefore conclude that there is no basis to dismiss the Amended Complaint on the ground that Plaintiffs' allegations failed to satisfy the jurisdictional requirement of material support.
 
 
 30
 B. The sufficiency of Plaintiffs' allegations of the provision of material support by an official, employee or agent of Sudan while acting within the scope of his or her governmental authority
 
 
 31
 Sudan further argues that Plaintiffs failed to allege that a Sudanese official acting within the scope of his or her governmental authority provided the alleged material support, as required by § 1605(a)(7). Again, we disagree.
 
 
 32
 Plaintiffs easily satisfy this requirement with their allegation that "Omar Hassan Ahmad al Bashir, president of the Republic of Sudan, authorized the entry into the Republic of Sudan by Al-Qaeda operatives and gave Al-Qaeda special authority to avoid paying taxes and duties ordinarily due to" Sudan. Am. Compl. ¶ 27(d) (emphasis added). At times relevant to these proceedings, President Bashir was "an official, employee, or agent" of Sudan by virtue of his elected position and the broad governmental authority he wielded under the constitution of Sudan in force at the time. See generally Constitution of the Republic of Sudan (repealed 2005), available at http:// www.sud an.net/government/constitution/english.html.
 
 
 33
 Moreover, President Bashir's alleged actions fell "within the scope of his . . . office, employment, or agency" because each involved the exercise of the governmental authority vested in the office of president by Sudan's constitution. As noted above, Plaintiffs allege that President Bashir authorized the entry of Al-Qaeda operatives into Sudan and granted those operatives special tax considerations. Am. Compl. ¶ 27(d). The authority to control both immigration and taxation in Sudan were constitutionally allocated to the federal government. Constitution of the Republic of Sudan arts. 110(c), 110(j), 113(b) (repealed 2005). The power of the federal government under that document was exercised by the President of Sudan, along with a Council of Ministers who were appointed by the President. Constitution of the Republic of Sudan arts. 42, 47, 49 (repealed 2005). Based on this governmental structure and allocation of power, we conclude that President Bashir's alleged actions were within the scope of his office and, therefore, that the actions set forth in the Amended Complaint satisfy § 1605(a)(7)'s requirement that Plaintiffs allege the provision of material support by an official of the government acting within the scope of his authority.[5]
 
 
 34
 C. The sufficiency of Plaintiffs' allegations of jurisdictional causation
 
 
 35
 Sudan argues that Plaintiffs failed to allege sufficient facts to draw a causal connection, for pleading purposes, between the alleged provision of material support to Al-Qaeda and the deaths caused by the bombing of the U.S.S. Cole. For the reasons that follow, we must reject this argument as well.
 
 
 36
 Section 1605(a)(7) strips a foreign state of its sovereign immunity only where damages are sought for an injury "that was caused by . . . the provision of material support or resources [for certain acts of terrorism]." § 1605(a)(7) (emphasis added). Courts have interpreted this statutory language to create a "jurisdictional causation" requirement that a plaintiff must meet to overcome a sovereign immunity-based challenge to subject matter jurisdiction under § 1605(a)(7). See Kilburn v. Socialist People's Libyan Arab Jamahiriya, 376 F.3d 1123, 1129 (D.C.Cir.2004); Owens, 412 F.Supp.2d at 109-10.
 
 
 37
 Jurisdictional causation under § 1605(a)(7) is distinct from the substantive causation element of a claim. See Kilburn, 376 F.3d at 1129. Our decision today reaches only the type of causation that § 1605(a)(7) requires to overcome foreign sovereign immunity and establish subject matter jurisdiction over an action against a foreign state. "To succeed in the end, the plaintiff[s] must go beyond jurisdiction and provide proof [of causation that] satisf[ies] a substantive cause of action." Id. That a plaintiff must ultimately establish substantive causation addresses any lingering concerns that a foreign state could be exposed to damages for remote or attenuated acts of support. Id.
 
 
 38
 Sudan argues that Plaintiffs' allegations do not satisfy jurisdictional causation because they contain factual gaps that break the causal chain between Sudan's support of Al-Qaeda and the bombing of the U.S.S. Cole. Sudan appears to advocate the same but-for standard for jurisdictional causation that the D.C. Circuit confronted in Kilburn, discussed below. See id. at 1127-29. (rejecting Libya's argument that § 1605(a)(7) requires allegations that the acts of terrorism would not have occurred without its support). In practical terms, Sudan's position would require a plaintiff to plead sufficient facts to chart a direct and unbroken causal line between a state's provision of material support and an ultimate act of terrorism. However, neither the text of the statute nor relevant authority warrants adoption of such a stringent standard for purposes of surviving a motion to dismiss.
 
 
 39
 In Kilburn, the D.C. Circuit interpreted the "caused by" language of § 1605(a)(7) to require only a showing of proximate cause. 376 F.3d at 1128. Proximate cause is normally satisfied where there is a "reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered." W. Keeton et al., Prosser & Keeton on the Law of Torts 263 (5th ed.1984). The D.C. Circuit based its conclusion on the Supreme Court's interpretation of identical jurisdictional language in the Extension of Admiralty Jurisdiction Act ("Extension Act"), 46 U.S.C.A. app. § 740 (West 1975 & Supp. 2006).[6] Kilburn, 376 F.3d at 1128 (citing Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 536-38, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995)). In construing the Extension Act in Grubart, the Supreme Court rejected an attempt to require close temporal and spatial proximity between a harm and the action that allegedly caused it. Grubart, 513 U.S. at 536, 115 S.Ct. 1043. Instead, the Court held that the concept of proximate cause provided the proper measure for jurisdictional causation. In Kilburn, the D.C. Circuit applied Grubart's analysis to reject the defendant's attempt to subject jurisdictional causation under § 1605(a)(7) to a but-for standard. Kilburn, 376 F.3d at 1129-30.
 
 
 40
 Guided by these decisions, we agree that proximate cause is the appropriate standard to apply at this juncture. It serves simultaneously to weed out the most insubstantial cases without posing too high a hurdle to surmount at a threshold stage of the litigation. We find nothing in the relevant authority nor in the text of § 1605(a)(7) to support Sudan's call for a more stringent standard. See Kilburn, 376 F.3d at 1128. Instead, Plaintiffs must establish jurisdictional causation by alleging facts sufficient to establish a reasonable connection between a country's provision of material support to a terrorist organization and the damage arising out of a terrorist attack. See Kilburn, 376 F.3d at 1128; Owens, 412 F.Supp.2d at 111.
 
 
 41
 Plaintiffs' allegations satisfy this standard. As set forth above, Plaintiffs make both general and specific allegations regarding Sudan's involvement in the bombing. Am. Compl. ¶¶ 26, 27, 29, 30. Plaintiffs first make general allegations that Sudan "aided and abetted" the bombing with knowledge that Al-Qaeda had designed the attack to cause death or serious injury. Id. Plaintiffs then detail specific allegations that Sudan allowed Al-Qaeda to use its diplomatic pouch to ship explosives, allowed Al-Qaeda operatives to enter the country; granted Al-Qaeda relief from taxes, allowed Al-Qaeda to operate terrorist training camps in the country that provided instruction on the use of explosives, and allowed an Al-Qaeda operative to ship explosives from Sudan to Yemen, the site of the bombing. Id. ¶ 27(b), (d), (f), (h).
 
 
 42
 Plaintiffs' allegations are somewhat imprecise as to the temporal proximity of Sudan's actions to and their causal connection with the bombing of the U.S.S. Cole. Although the allegations describe actions on the part of Sudan that could have supported and facilitated the bombing, they do not chart a direct and unbroken factual line between Sudan's actions and the bombing. However, such imprecision is not fatal for purposes of jurisdictional causation so long as the allegations, and the reasonable inferences drawn therefrom, demonstrate a reasonable connection between Sudan's actions and the bombing. See Kilburn, 376 F.3d at 1128; Owens, 412 F.Supp.2d at 111. The allegations do so here by describing how Sudan provided Al-Qaeda a base of operations to plan and prepare for the bombing, and provided operational support for the attack. Accordingly, we find no merit in Sudan's contention that Plaintiffs failed to allege sufficient facts to support the jurisdictional causation element of § 1605(a)(7).
 
 
 43
 In summary, we find that Plaintiffs alleged sufficient facts to create subject matter jurisdiction under § 1605(a)(7) and, therefore, find no error in the district court's denial of Sudan's motion to dismiss for lack of subject matter jurisdiction.
 
 III.
 
 44
 Sudan next asks this court to exercise pendent appellate jurisdiction over the district court's denial of its motion to dismiss for lack of personal jurisdiction, which is a non-final order that is not otherwise immediately appealable. Sudan argues that we should do so to pro-mote the efficient use of judicial resources by foregoing the litigation that would potentially result from delaying review of this issue until after final judgment is entered in the district court. We must decline to exercise such jurisdiction, however.
 
 
 45
 It borders on the axiomatic that, subject to certain limited exceptions, our appellate jurisdiction is limited to final orders from the district courts. 28 U.S.C. § 1291 (2000). The district court's order denying Sudan's motion to dismiss for lack of personal jurisdiction is not a final order because it does not "end [ ] the litigation on the merits and leave[ ] nothing for the court to do but execute the judgment." Catlin v. United States, 324 U.S. 229, 233, 65 S.Ct. 631, 89 L.Ed. 911 (1945). Nor does it fall within the category of non-final orders that are immediately appealable under the collateral-order doctrine because they are "conclusive, . . . resolve important questions separate from the merits, and . . . are effectively unreviewable on appeal from the final judgment in the underlying action." Swint v. Chambers County Comm'n, 514 U.S. 35, 42, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995) (citing Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949)).[7] There is nothing that would prevent effective review of the denial of a motion to dismiss for lack of personal jurisdiction following final judgment in the district court. See Van Cauwenberghe v. Biard, 486 U.S. 517, 526-27, 108 S.Ct. 1945, 100 L.Ed.2d 517 (1988); Byrd v. Corporacion Forestal y Industrial de Olancho S.A., 182 F.3d 380, 381 n. 1 (5th Cir.1999).
 
 
 46
 Sudan nevertheless argues that we should review this issue under pendent appellate jurisdiction, a judicially-created, discretionary exception to the final judgment requirement. Under this exception, we retain the discretion to review issues that are not otherwise subject to immediate appeal when such issues are so interconnected with immediately appealable issues that they warrant concurrent review. See Taylor, 81 F.3d at 437. Pendent appellate jurisdiction is an exception of limited and narrow application driven by considerations of need, rather than of efficiency. See Montano v. City of Chicago, 375 F.3d 593, 599 (7th Cir. 2004); Taylor, 81 F.3d at 437. In Swint, the Supreme Court suggested that pendent appellate jurisdiction is available only (1) when an issue is "inextricably intertwined" with a question that is the proper subject of an immediate appeal; or (2) when review of a jurisdictionally insufficient issue is "necessary to ensure meaningful review" of an immediately appealable issue. Swint, 514 U.S. at 50-51, 115 S.Ct. 1203.
 
 
 47
 Sudan relies on a line of authority from the District of Columbia Circuit that suggested that the exercise of pendent appellate jurisdiction is appropriate based on "considerations of fairness or efficiency." Gilda Marx, Inc. v. Wildwood Exercise, Inc., 85 F.3d 675, 679 (D.C.Cir.1996); see also Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan, 115 F.3d 1020, 1026 (D.C.Cir.1997). However, the Supreme Court appears to have foreclosed such considerations in Swint. The Court there rejected an efficiency argument similar to Sudan's by reasoning that such arguments "drift away from the statutory instructions Congress has given to control the timing of appellate proceedings." Swint, 514 U.S. at 45, 115 S.Ct. 1203.
 
 
 48
 Moreover, since Swint, this court has consistently limited its application of pendent appellate jurisdiction to the two circumstances outlined therein. See, e.g. United States v. Bundy, 392 F.3d 641, 649 (4th Cir.2004); Altman v. City of High Point, 330 F.3d 194, 207 n. 10 (4th Cir. 2003); Antrican v. Odom, 290 F.3d 178, 191 (4th Cir.2002); Hinson v. Norwest Fin. S.C., Inc., 239 F.3d 611, 615 (4th Cir.2001); United States v. North Carolina, 180 F.3d 574, 581 n. 4 (4th Cir.1999); Jenkins v. Medford, 119 F.3d 1156, 1159 n. 2 (4th Cir.1997) (en banc); Taylor v. Waters, 81 F.3d 429, 437 (4th Cir.1996). The First through Eleventh Circuits have similarly limited their application of pendent appellate jurisdiction. See Kilburn, 376 F.3d at 1134 n. 7 (collecting cases).
 
 
 49
 We are constrained by the language of the Supreme Court as well as our own precedent from recognizing efficiency considerations as a basis for the exercise of pendent appellate jurisdiction. Because Sudan has not argued that jurisdiction is proper under either element of Swint, we decline to review the denial of its motion to dismiss for lack of personal jurisdiction and dismiss that portion of its appeal.
 
 IV.
 
 50
 Sudan next argues that we should exercise pendent appellate jurisdiction over its claim that Plaintiffs lack standing based on the Death on the High Seas Act ("DOHSA"), 46 U.S.C. app. §§ 761-767 (West 1975 & Supp.2006).[8] Sudan argues that resolution of this standing issue is necessary to ensure meaningful review of the issue of subject matter jurisdiction because "[i]f Plaintiffs have no standing to bring the claims asserted, the Court's decision on the FSIA issue will be an advisory opinion." Appellant's Br. at 5. Even if we were inclined to consider an issue taken under advisement and not ruled on by the district court, we find no basis to exercise jurisdiction over this issue.
 
 
 51
 The standing issue and the FSIA issue are not sufficiently interconnected to justify pendent appellate jurisdiction. Under the elements of Swint, jurisdiction is appropriate where issues are (1) "so intertwined that we must decide the pendent issue in order to review the claims properly raised on interlocutory appeal or [ (2) ] resolution of the issue properly raised on interlocutory appeal necessarily resolves the pendent issue." Cunningham v. Gates, 229 F.3d 1271, 1285 (9th Cir.2000) (citations omitted); see also Berrey v. Asarco, Inc., 439 F.3d 636, 647 (10th Cir. 2006). Neither situation exists here. Resolution of Sudan's FSIA argument neither required us first to decide nor necessarily decides the issue of standing under DOHSA. In fact, our analysis of the FSIA issue did not address, or even refer to, the issue of standing. Each issue involves a distinct legal concept that does not affect analysis of the other. Accordingly, we find no basis to exercise pendent appellate jurisdiction over the issue of standing.
 
 
 52
 Contrary to Sudan's argument, our decision not to exercise jurisdiction over this issue does not threaten to render our ruling on the FSIA issue advisory. We would issue an advisory opinion were we to pass "judgment upon issues which remain unfocused because they are not pressed before the Court with that clear concreteness provided when a question emerges precisely framed and necessary for decision from a clash of adversary argument exploring every aspect of a multifaceted situation embracing conflicting and demanding interests." United States v. Fruehauf, 365 U.S. 146, 157, 81 S.Ct. 547, 5 L.Ed.2d 476 (1961). No such danger exists here. We have decided the issue of subject matter jurisdiction based on a concrete set of facts in the context of a live controversy between the parties. The fact that Plaintiffs' case might eventually succumb to a dispositive defect, such as lack of standing, does not alter the concrete nature of the dispute before us today or the propriety of our ruling.
 
 
 53
 Because no basis exists to exercise jurisdiction over Sudan's standing argument, we decline review and dismiss that portion of its appeal.
 
 V.
 
 54
 Although the issue is presented obliquely in its brief, Sudan seeks appellate review of the district court's ruling that venue for this action was proper in the Eastern District of Virginia. An order denying a motion to dismiss for improper venue, however, is interlocutory and not immediately appealable. La. Ice Cream Distribs., Inc. v. Carvel Corp., 821 F.2d 1031, 1033 (5th Cir.1987). Therefore, we lack appellate jurisdiction over this issue. Sudan does not argue that we should exercise pendent appellate jurisdiction over this issue and we discern no reason to do so. Therefore, we decline to exercise jurisdiction to review the district court's order regarding venue and dismiss that portion of Sudan's appeal.
 
 VI.
 
 55
 In light of the foregoing, we affirm the district court's denial of Sudan's motion to dismiss for lack of subject matter jurisdiction and dismiss the remainder of Sudan's appeal for lack of appellate jurisdiction.
 
 
 56
 
 AFFIRMED IN PART AND DISMISSED IN PART.
 
 
 
 
 Notes:
 
 
 [1]
 We have jurisdiction to review this issue because "[o]rders denying sovereign immunity are immediately appealable collateral orders."Eckert Int'l, Inc. v. Gov't of the Sovereign Democratic Republic of Fiji, 32 F.3d 77, 79 (4th Cir.1994).
 
 
 [2]
 Section 1605(a)(7) provides that a foreign state that has been designated as a state sponsor of terrorism is not immune from a suit
 in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.
 § 1605(a)(7).
 
 
 [3]
 "Because sovereign immunity is in the nature of an affirmative defense, the plaintiff need not prove the absence of sovereign immunity in the first instance; rather, `the defendant bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity.'"Owens v. Republic of Sudan, 412 F.Supp.2d 99, 104 (D.D.C.2006) (citing Phoenix Consulting, Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C.Cir.2000)) (emphasis omitted).
 
 
 [4]
 The United States has designated Sudan a state sponsor of terrorism. 58 Fed.Reg. 52523-01 (Oct. 8, 1993)
 
 
 [5]
 Although we focus here on the actions of the president in the exercise of his specific authority, we note as well that other aspects of providing safe haven to Al-Qaeda also necessarily involved official governmental support. For example, as the district court recognized, permitting the use of diplomatic pouches, granting relief from taxes and duties, allowing the establishment and operation of terrorist training camps, and establishing financial joint ventures between Sudan and Al-Qaeda, Am. Compl. ¶ 27(a)-(i), could only be carried out by government officials acting within the scope of their officesSee Rux v. Republic of Sudan, No. 2:04-CV-428, 2005 WL 2086202 (E.D.Va. Aug. 26, 2005) (unpublished).
 
 
 [6]
 The relevant text of the Extension Act states: "The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property,caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land." 46 U.S.C. app. § 740 (emphasis added).
 
 
 [7]
 Non-final orders are also immediately appealable in other limited circumstancesSee 28 U.S.C. §§ 1292(a) & (b) (2000); Fed. R.Civ.P. 54(b). Having carefully reviewed the record, we conclude that neither the facts nor procedural history of this case implicate any of these exceptions.
 
 
 [8]
 This issue is not otherwise immediately appealable because the order being appealed neither terminated this action nor resolved Sudan's standing argumentSee § 1291; Swint, 514 U.S. at 42, 115 S.Ct. 1203 (recognizing that a decision must conclusively resolve an issue for the collateral order doctrine to apply).