**WYE OAK TECHNOLOGY, INCORPORATED,**
Plaintiff–Appellee,

v.

**REPUBLIC OF IRAQ,** Defendant–Appellant.

No. 10–1874.

United States Court of Appeals, Fourth Circuit.

Argued: Oct. 25, 2011.

Decided: Dec. 29, 2011.

**ARGUED:** Craig Crandall Reilly, Alexandria, Virginia, for Appellant. Robert James Pavich, Pavich Law Group, Chicago, Illinois, for Appellee. **ON BRIEF:** Timothy B. Mills, Maggs & McDermott, LLC, Washington, D.C., for Appellant. John H. Quinn, Jr., Matthew M. Connell, Quinn, Racusin & Gazzola Chartered, Washington, D.C.; John J. Pavich, Pavich Law Group, Chicago, Illinois; Anthony D'Amato, Northwestern University School of Law, Chicago, Illinois, for Appellee.

Before SHEDD and DUNCAN, Circuit Judges, and WILLIAM L. OSTEEN, JR., United States District Judge for the Middle District of North Carolina, sitting by designation.

Affirmed by published opinion. Judge DUNCAN wrote the majority opinion, in which Judge OSTEEN joined. Judge SHEDD wrote a dissenting opinion.

## OPINION

DUNCAN, Circuit Judge:

Under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602–11 ("FSIA"), a federal court has subject matter jurisdiction over a claim against a foreign state only if that claim falls within one of the FSIA's exceptions to immunity. This appeal raises the question of whether, for purposes of analyzing subject matter jurisdiction under the FSIA, a foreign state and its armed forces are separate legal

persons. For the reasons that follow, we conclude that, for jurisdictional purposes, they are not. We therefore hold that appellee Wye Oak Technology, Inc.'s ("Wye Oak") claim against the Republic of Iraq ("Iraq") alleging breach of a contract entered into by Iraq's Ministry of Defense ("IMOD") falls within the FSIA's commercial activities exception. We accordingly affirm the district court's denial of Iraq's motion to dismiss Wye Oak's claim for lack of subject matter jurisdiction.[1]

## I.

### A.

This case arises out of a contract entered into by IMOD and Wye Oak for the refurbishment and disposal of Iraqi military equipment. The contract, executed on August 16, 2004, appointed Wye Oak as IMOD's broker for, inter alia, "the accounting, inventory, and assessment of discarded and/or damaged Military Equipment," for the purposes of "indentify[ing] which Military Equipment is salvageable and suitable for Military Refurbishment Services and which Military Equipment is scrap" and "arranging ... Scrap Sales." J.A. 22. The contract went on to call for Wye Oak, as broker, to "use all reasonable commercial efforts ... in the development of markets and sales prospects for Military equipment." J.A. 23. IMOD agreed under the contract to provide offices in Iraq for Wye Oak to facilitate the broker activities, but Wye Oak was "responsible for its own administrative costs." J.A. 25. As to compensation, the contract called for IMOD to pay Wye Oak a commission equal

to 10 percent of any sale of equipment and a commission equal to 10 percent of any refurbishment costs. The contract required IMOD to make "full payment" of these commissions "immediately upon presentation" to it of invoices by Wye Oak. J.A. 24. The contract was signed by Dr. Bruska Noori Shaways, Secretary General of IMOD, and Dale C. Stoffel, President of Wye Oak.

On the same day the contract was executed, Shaways signed a letter addressed to Stoffel, which referenced the contract as follows:

> Wye Oak ... is commissioned as the sole and exclusive agent for the recovery and sale of all Iraqi Ministry of Defense material described as scrap military equipment in the territory of Iraq. Related thereto, Wye Oak is also commissioned to inventory, assess and recover any such equipment it determines as recoverable for the use or sale on behalf of the Ministry of Defense of the Republic of Iraq.

J.A. 29.

Less than five months later, Stoffel attended a meeting in Baghdad to discuss contract performance. Three days after the meeting, while still in Iraq, he was shot and killed by unidentified assailants.

### B.

On July 20, 2009, Wye Oak filed suit against Iraq, but not IMOD, in the U.S. District Court for the Eastern District of Virginia, seeking damages for breach of contract. Wye Oak alleged in its complaint that it "performed under the Con-

---

**1.** This case actually presents two questions of jurisdiction. The first involves Iraq's immunity from suit in federal court. The second arises because the district court transferred the case to the U.S. District Court for the District of Columbia after issuing its opinion on subject matter jurisdiction. We therefore requested supplemental briefing on the issue of our jurisdiction to hear this interlocutory appeal. Both sides asserted that we have appellate jurisdiction, and we agree. We will address the second issue more fully before addressing the first.

tract by, among other things ... identifying and arranging for the sale of scrap military equipment." J.A. 13. Wye Oak also alleged that, pursuant to the contract, it performed activities in the United States, including "[a]ccounting," creating "[c]omputer programs for tracking military equipment," "[c]ontacting agents of foreign governments who might have been interested in buying scrap," and "[c]reating spread-sheet systems to ensure that pricing of scrap equipment ... could be compared and correlated with ... world market prices." J.A. 14. Wye Oak further alleged that it submitted invoices to IMOD in October 2004 totaling more than $24 million but that no payment was received. Wye Oak alleged that during the December 5, 2004, meeting, "[i]t was agreed that payment [on the invoices], which had been authorized by [Iraq] in October 2004, would be made to Wye Oak directly and immediately." J.A. 16. Finally, Wye Oak alleged that despite this agreement, no payment was made and that "[b]y not paying these invoices ... [Iraq] breached" the contract. J.A. 17.

On March 29, 2010, Iraq moved to dismiss Wye Oak's complaint pursuant to Federal Rules of Civil Procedure 12(b)(2) and (5) for lack of personal jurisdiction, 12(b)(1) for lack of subject matter jurisdiction, and 12(b)(3) for improper venue.

As to subject matter jurisdiction, Iraq argued that it was immune from suit pursuant to the FSIA and fell within none of its exceptions. Wye Oak responded that Iraq was subject to jurisdiction under the FSIA's commercial activities exception.

The FSIA provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter." 28 U.S.C. § 1604. Thus, a foreign state is immune from suit in U.S. courts unless an exception applies.

Section 1605, in turn, provides the exception to immunity that is at the heart of this appeal, the commercial activities exception, which we will discuss more fully in our analysis below.

After the parties completed initial briefing, Iraq sought and was granted leave to present the new argument that because the contract giving rise to the claim was between Wye Oak and IMOD, and not between Wye Oak and Iraq, Wye Oak failed to plead particular facts sufficient to make out a prima facie case that the commercial activities exception applied to Wye Oak's claim. Iraq presented as evidence a declaration by Omar Ghassan Jamil Al-Wiswasi, Acting Director General of the Legal Department of the Ministry of Justice of Iraq, in which it is asserted, inter alia, that IMOD "was and continues to be a separate and independent legal person from ... the Republic of Iraq ... with separate legal identity, including ... for purposes of entering into and fulfilling contracts and for liability under any contracts entered into by [IMOD]." J.A. 44–45. The district court took this assertion as true for the purposes of deciding the motion to dismiss.

On June 22, 2010, the district court held a hearing and on June 29, 2010, the district court denied Iraq's motion to dismiss. The district court concluded that the allegations and facts presented were sufficient to bring Wye Oak's claim against Iraq within the commercial activities exception. The district court held that the commercial activities exception would be applied to the claim against Iraq in this case—even though the contract was with IMOD and Iraqi law makes IMOD a separate legal person from Iraq—because under the FSIA, Iraq and IMOD "are treated as one and the same." J.A. 150. The district court further noted that the separate question of whether Iraq could ultimately be

held liable for the acts of IMOD, given the state of Iraqi law, "is inextricably bound up with the ultimate merits of the case, as framed by the complaint, and cannot be resolved within the present posture of the case." J.A. 151.

In its order denying Iraq's motion to dismiss, the district court also concluded that venue was improper. Rather than dismiss the complaint, however, the district court chose to cure the venue defect by immediately transferring the case to the U.S. District Court for the District of Columbia.[2] This appeal followed. The transferee district court has stayed the case pending the outcome of this appeal.

## II.

We begin with an examination of our jurisdiction to hear this appeal. Both parties argued in supplemental briefing that we have such jurisdiction under our decision in *Technosteel, LLC v. Beers Constr. Co.*, 271 F.3d 151 (4th Cir.2001). We agree.

Preliminarily, however, we feel compelled to note that our consideration of the issue before us has not been aided by the procedural posture in which it is presented. The district court could have done one of two things that would have greatly aided our review. First, it could have transferred the case to the district court in the District of Columbia *prior* to reaching the issue of jurisdiction, so that the D.C. district court could have considered the issue, with review by the D.C. Circuit in the normal course. Alternatively, the district court could have stayed its transfer order pending our consideration of the interlocutory appeal. As we and other courts have stated, when an immediately appealable order is issued prior to transfer, "the bet-

ter practice would be for the district court to stay any transfer for the thirty-day appeal period and, if an appeal is filed, during the time the appeal ... is pending in our court." *Technosteel,* 271 F.3d at 161 n. 8. That it did neither requires us to address the nature of our review in somewhat anomalous circumstances.

When a case has been transferred, generally "the transferor court—and the appellate court that has jurisdiction over it— loses all jurisdiction over the case and may not proceed further with regard to it." 15 Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 3846 (4th ed.2007). This court and other circuits to have considered the issue, however, have recognized an exception to this rule when, prior to transfer, the district court has entered an immediately appealable order.

In *Technosteel,* we held, "under any view of the jurisdictional limitations imposed by [28 U.S.C.] § 1294(1) and its interplay with a [28 U.S.C.] § 1404(a) transfer, precedent simply does not dictate the holding that we lose jurisdiction to review immediately appealable, and timely appealed, decisions of our district court ... simply because the district court simultaneously chose to transfer the balance of the case for litigation elsewhere." 271 F.3d at 157. We went on to reason that because the district court's decision in that case was immediately appealable "without need for any action by the parties or the court," the decision was "effectively severed from the balance of the case" and so did not travel with the rest of the case to the transferee district but instead remained appealable in the transferor circuit. *Id.* at 159, 160.

---

**2.** The district court also rejected Iraq's challenge to the district court's personal jurisdiction. Iraq does not appeal the denial of its

motion to dismiss for lack of personal jurisdiction, and Wye Oak does not appeal the district court's finding of improper venue.

Although *Technosteel* involved an appeal of an order denying a petition to compel arbitration, we and the other circuits to have considered the issue believe its reasoning applies more broadly.[3] The district court's decision denying Iraq the protections of foreign sovereign immunity, like a denial of a petition to compel arbitration, is immediately appealable without need for any action by the parties or the court.[4] The district court's decision was thus severed from the remainder of the case that traveled to the transferee court and remains appealable in this circuit pursuant to § 1294(1).[5] Accordingly, we hold that this court has jurisdiction to hear Iraq's appeal.[6]

---

**3.** *See, e.g., Matrix Grp. Ltd., Inc. v. Rawlings Sporting Goods Co.,* 378 F.3d 29, 32 (1st Cir. 2004) (appeal of order denying injunction); *Jones v. InfoCure Corp.,* 310 F.3d 529, 533–34 (7th Cir.2002) (same).

**4.** "Orders denying sovereign immunity are immediately appealable collateral orders." *Eckert Int'l, Inc. v. Gov't of the Sovereign Democratic Republic of Fiji,* 32 F.3d 77, 79 (4th Cir.1994).

**5.** Although the case is no longer within our circuit, presumably our decision will become law of the case in the transferee district and circuit. *See* 18B Wright, Miller, & Cooper, *supra,* at § 4478.4 ("Special situations ... may bring the same case successively to different courts of appeals.... In all of these circumstances, an appellate court tends to defer to the earlier appellate decision in much the same way as it would defer to its own earlier decision."); *see also Hill v. Henderson,* 195 F.3d 671, 678 (D.C.Cir.1999) (recognizing that "a decision of a court of coordinate status is entitled to be considered 'law of the case' ").

**6.** As in *Technosteel,* we are further persuaded that appellate jurisdiction is appropriate here due to the anomalous results that would ensue were we to hold otherwise. *See* 271 F.3d at 160–61. Because the district court that issued the decision lies in our circuit, § 1294(1) would prevent the transferee circuit from hearing this appeal. *See id.* at 156 ("TechnoSteel's petition to compel arbitration was immediately appealable ... and ... it was immediately appealable *only to us, see* 28 U.S.C § 1294(1)." (emphasis added)); *Hill,* 195 F.3d at 675 (suggesting that, in these circumstances, pursuant to § 1294(1), immediately appealable orders must be reviewed by the transferor circuit). Consequently, we could not transfer the appeal to the D.C. Circuit because, pursuant to 28 U.S.C. § 1631, an appeal may only be transferred to a circuit court in which the appeal could originally have been filed. This appeal would thus have to be dismissed, leaving the decision of the transferor district court intact and operating as law of the case. In turn, the law of the case doctrine would constrain the transferee district court to adhere to the transferor district court's decision unless the transferee district court finds that the transferor district court's rulings were "clearly erroneous and would work a manifest injustice." *Arizona v. California,* 460 U.S. 605, 618 n. 8, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983).

It is also far from clear that the D.C. Circuit, on appeal, could directly review the underlying decision from the transferor district court, rather than merely reviewing the application of the law of the case doctrine by its district court. *Cf. Chrysler Credit Corp. v. Country Chrysler, Inc.,* 928 F.2d 1509, 1518 (10th Cir.1991) (noting that although "a court of appeals in the transferee circuit lacks jurisdiction to review the judgments of [a] district court in the transferor circuit ... nothing ... precludes the parties from arguing or the transferee circuit from reviewing whether the transferee district court correctly applied the law of the case in the transferred action"). This chain of events could result in the district court's decision escaping de novo review entirely. Such an outcome is particularly inappropriate in these circumstances, given the importance of foreign sovereign immunity and considerations of respect and comity that follow it. *Cf. Phoenix Consulting Inc. v. Republic of Angola,* 216 F.3d 36, 39 (D.C.Cir. 2000) ("[T]o defer the question [of foreign sovereign immunity] is to 'frustrate the significance and benefit of entitlement to immunity from suit.' ") (quoting *Foremost–McKesson, Inc. v. Islamic Republic of Iran,* 905 F.2d 438, 449 (D.C.Cir.1990)).

With respect to the views of our dissenting colleague on this issue, we make three points. First, both the majority as well as the parties believe that posture of this case brings us within the operating rules established by our precedent. Second, both the majority as well as the parties also believe that the law of the case has much greater force than contemplated by our dissenting colleague. Finally, we question whether the alternative proposed by the dissent, *see* post at 220 n. 5—that we decline to exercise appellate jurisdiction for prudential reasons due to the unsettled nature of the law in this area and the complicated procedural posture of the case—is either appropriate or workable. This order is only appealable to us, *see* ante at 210 n. 6, and we have limited discretion as to which appeals we may hear and decide. *See, e.g., Colo. River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) (stating that federal courts have a "virtually unflagging obligation ... to exercise the jurisdiction given them"); *Cohens v. Virginia,* 19 U.S. (6 Wheat.) 264, 404, 5 L.Ed. 257 (1821) (Marshall, C.J.) ("We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not

given."). We are unaware of any authority that allows us to generally decline to hear an appeal solely because the law or facts involved are complicated or unsettled.[7]

In view of the concerns expressed in the dissent, however, we once again stress the preferability of the district court's either transferring a case prior to ruling on a motion to dismiss, or staying the transfer pending appeal.

## III.

Agreeing with the parties as to our jurisdiction to hear this appeal, we now turn to a consideration of the merits. On appeal, Iraq challenges the district court denial of its motion to dismiss for lack of subject matter jurisdiction pursuant to the FSIA.

Iraq makes two arguments in support of its position. First, Iraq argues that the district court erred by not treating Iraq and IMOD as separate legal persons for the purposes of applying the FSIA's commercial activities exception. Second, Iraq argues that even if it and IMOD are not separate legal persons for this purpose,

---

**7.** We also respectfully disagree with the dissent's argument that comity calls for us to decline to exercise appellate jurisdiction and dismiss the appeal. Comity—like other considerations underlying the discretionary declination of jurisdiction—operates in a very limited set of circumstances, and we are reluctant to expand its operation. *See Fair Assessment in Real Estate Ass'n, Inc. v. McNary,* 454 U.S. 100, 119–20, 102 S.Ct. 177, 70 L.Ed.2d 271 (1981) (Brennan, J., concurring) ("While the 'principle of comity' may be a source of judicial policy, it is emphatically no source of judicial power to renounce jurisdiction. The application of the comity principle has thus been limited to a relatively narrow class of cases."); *accord Quackenbush v. Allstate,* 517 U.S. 706, 716, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996) ("[F]ederal courts may decline to exercise their jurisdiction, in ... ex-

ceptional circumstances." (internal quotations omitted)). *Cf. Quackenbush,* 517 U.S. at 716–720, 116 S.Ct. 1712 (noting that abstention is only appropriate in "cases in which the court has discretion to grant or deny relief," and instructing that in actions for damages, "abstention principles ... only ... permit a federal court to enter a stay order that *postpones* adjudication of the dispute").

In any case, we are not persuaded that declining to exercise appellate jurisdiction here would serve the interests of comity. First, we note that in deciding this appeal, we are following a rule previously set forth by the transferee circuit itself. *See Hill,* 195 F.3d at 675. Second, we believe our decision here will aid our sister circuit in the orderly consideration of issues in this case.

Wye Oak's allegations are insufficient to bring its claim against Iraq within the commercial activities exception.

■ We review de novo a district court's decision concerning the existence of subject matter jurisdiction under the FSIA. *Rux v. Republic of Sudan,* 461 F.3d 461, 467 (4th Cir.2006). "Once the defendant has asserted the jurisdictional defense of immunity under the FSIA, [our] focus shifts to the exceptions to immunity." *Phoenix Consulting,* 216 F.3d at 40; *see also Rux,* 461 F.3d at 468. Wye Oak's complaint "must include sufficient facts to support a reasonable inference that [its] claims satisfy" the FSIA's commercial activities exception. *Rux,* 461 F.3d at 468. Because Iraq challenges only the legal sufficiency of Wye Oak's jurisdictional allegations,[8] and because Iraq's assertion that Iraqi law treats Iraq and IMOD as sepa-

rate legal persons is undisputed, we take Wye Oak's allegations and Iraq's assertion as true and determine whether the commercial activities exception applies. *See Phoenix Consulting,* 216 F.3d at 40; *Robinson v. The Government of Malaysia,* 269 F.3d 133, 138 (2d Cir.2001).

**A.**

We first consider the most significant question for the purposes of determining whether Iraq is immune under the FSIA here: whether we are to treat Iraq and IMOD as separate legal persons in applying the FSIA's commercial activities exception to Wye Oak's claim.[9] The district court held that, under the FSIA, Iraq and IMOD were not separate legal persons and that, therefore, Wye Oak's allegations as to IMOD could be used to bring its claim against Iraq within the commercial activi-

---

8. "In some cases ... the motion to dismiss will present a dispute over the factual basis of the court's subject matter jurisdiction under the FSIA, that is, either contest a jurisdictional fact alleged by the plaintiff, or raise a mixed question of law and fact. When the defendant has thus challenged the factual basis of the court's jurisdiction, the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant. Instead, the court must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." *Phoenix Consulting,* 216 F.3d at 40 (internal citations omitted). Iraq has made no specific challenges to the factual allegations we rely on for our analysis.

Iraq made a general challenge to all of Wye Oak's allegations, labeling them "dubious and exaggerated." Appellant's Br. 51. Such general challenges, however, do not constitute a "dispute over the factual basis." Iraq makes no specific challenge to any factual allegation we rely on in reaching our conclusion. Should later events support a specific factual challenge on the part Iraq, it can, of course, renew its motion to dismiss or file a motion for summary judgment, as appropriate.

9. At the outset, we note that Iraq's concern that our decision will affect its ultimate liability is misplaced. Determinations under FSIA go only to jurisdiction, and Iraq will be free to challenge its liability later in the case. *See First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 620, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) (hereinafter *"Bancec"*) (stating that FSIA "was not intended to affect the substantive law determining the liability of a foreign state"). In other words, what we are concerned with here is not Wye Oak's argument that Iraq is liable on the contract but rather whether Wye Oak is entitled to the opportunity to make such an argument at all.

Likewise, we disagree with Iraq that the district court erred in delaying consideration of whether Iraq was ultimately liable for the acts of IMOD. Iraq portrays the district court's action as improperly putting off a necessary jurisdictional inquiry. As we read its opinion, however, the district court was delaying a merits inquiry, not a jurisdictional inquiry. Accordingly, we find no error in the district court's refusal to resolve a merits issue when ruling on a motion made under Rule 12(b)(1), rather than under Rule 12(b)(6).

ties exception. Iraq asserts that this question—even though it involves application of the FSIA's commercial activities exception—is not to be answered by reference to the FSIA, but instead by reference to Iraqi law, which Iraq argues mandates that it and IMOD be treated as separate legal persons.[10] We disagree. We first conclude that the FSIA is the appropriate lens through which to analyze this question. Applying the FSIA's text, we then conclude that Iraq and IMOD are not legally separate persons for the purposes of applying the FSIA's commercial activities exception. Finally, we proceed to apply the FSIA's commercial activities exception.

### 1.

■ In determining which law to apply to the question of whether Iraq and IMOD are legally separate persons for the purposes of determining immunity under the FSIA, we begin with the premise that the question of a foreign state's entitlement to sovereign immunity—which necessarily includes an examination of exceptions to that immunity—is a question of subject matter jurisdiction. *See Rux*, 461 F.3d at 472. Next, we follow the "settled proposition that the subject-matter jurisdiction of the lower federal courts is determined by Congress 'in the exact degrees and character which to Congress may seem proper for the public good.'" *Ar-*

*gentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 433, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989) (quoting *Cary v. Curtis*, 44 U.S. (3 How.) 236, 245, 11 L.Ed. 576 (1845)). Congress has set forth the exact degree and character of foreign state's entitlement to immunity—and hence the jurisdiction of federal courts to hear a claim against that foreign state—in the FSIA. *See* 28 U.S.C. § 1602 ("Claims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter."). Accordingly, we conclude that it is the FSIA, and not Iraqi law, that provides the framework for determining whether Iraq and IMOD are to be treated a separate legal persons in applying the FSIA's commercial activities exception.

Resisting this syllogism, Iraq asserts that the Supreme Court in *Bancec* held that, in this context, "the status of an entity as a separate [legal] person is properly governed by the law under which it is organized." Appellant's Br. 24. We find no basis for Iraq's interpretation of *Bancec*. In *Bancec*, the Court had to decide whether to hold a state-owned bank—a separate legal person under Cuban law—responsible for certain debts of the state. Relying on the facts presented to it, the Court held that equitable principles required it to ignore that separate legal sta-

---

**10.** Iraq does not dispute the second part of the district court's conclusion that if it is the case that IMOD and Iraq are not separate legal persons for the purpose of applying FSIA's commercial activities exception, it necessarily follows that Wye Oak's allegations as to IMOD may be used to bring Wye Oak's claim against Iraq within the commercial activities exception. We also find no reason not to follow this logical conclusion, which is identical to the result reached when other sub-state entities are determined not to be separate legal persons. *See, e.g., Doe v. Holy See*, 557 F.3d 1066, 1078–79 (9th Cir.2009)

(noting that the commercial activities of an agency or instrumentality of a foreign state can be used to bring the foreign state itself within the commercial activities exception if the government's control over the agency or instrumentality is sufficient to destroy legal separateness); *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 848 (D.C.Cir.2000) (noting that "[a] sovereign is amenable to suit based upon the actions of an instrumentality it dominates because the sovereign and the instrumentality are in those circumstances not meaningfully distinct entities; they act as one").

tus and impute the state's liability to the bank. 462 U.S. at 631–33, 103 S.Ct. 2591. If anything, the Court's reasoning in *Bancec* undermines Iraq's argument. Indeed, the Court in *Bancec* ultimately rejected the argument—similar to Iraq's here—that "the effect to be given to [an entity's] separate [legal] status," is to be determined by "the law of the state that establishes" the entity. *Id.* at 621, 103 S.Ct. 2591. The Court rejected this argument because "[t]o give conclusive effect to the law of the chartering state ... would permit the state to violate with impunity the rights of third parties under international law while effectively insulating itself from liability in foreign courts." *Id.* at 621–22, 103 S.Ct. 2591. We agree.

### 2.

Having concluded that our analysis as to whether Iraq and IMOD are legally separate in this context must proceed through the FSIA, we now turn to the language of the statute. As we explain below, the statutory text supports our conclusion that a foreign state and its armed forces are not legally separate for jurisdictional purposes. Briefly, the FSIA applies to the component parts of a foreign state, distinguishing those that are legally separate from the foreign state from those that are not. Applying this statutory dichotomy to the IMOD, we conclude that it is among the category of entities that are not legally distinct.

The FSIA applies not only to a foreign state, but also to that state's components, such as the IMOD. 28 U.S.C. § 1603(a). After noting that the term "foreign state" includes a "political subdivision" thereof, the FSIA goes on to further differentiate an "agency or instrumentality" in terms

that are significant to our discussion: an agency or instrumentality, under the FSIA, is "a separate legal person." *Id.* at § 1603(b)(1). The distinction has consequences in terms of an entity's rights and responsibilities under the FSIA. For example, as would logically follow with respect to a separate legal entity, punitive damages are available only against an agency or instrumentality. *Id.* at § 1606. Agencies or instrumentalities are also more vulnerable to attachment of U.S.-based property. *Id.* at § 1610.

As the statutory text attributes separate legal status only to an agency or instrumentality, which is, in turn, distinguished as a subset of "political subdivision," the FSIA creates a dichotomy in which a political subdivision does not have separate legal personhood unless it qualifies as an agency or instrumentality. *See Magness v. Russian Federation*, 247 F.3d 609, 613 n. 7 (5th Cir.2001) ("Under 28 U.S.C. § 1603(a), the term 'political subdivision' includes all governmental units beneath the central government. An 'agency or instrumentality' of a foreign state, on the other hand, is defined as any ... political subdivision of a foreign state which is a separate legal person or entity."). We must therefore decide whether IMOD is a political subdivision or an agency or instrumentality.[11]

■ To determine whether an entity is an agency or instrumentality—and thus legally separate from the foreign state—or a mere political subdivision, courts ask "whether the core functions of the foreign entity are predominantly governmental or commercial." *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 151 (D.C.Cir.1994). If the core functions are

---

11. Although Iraq has conceded that IMOD is a political subdivision and not an agency or instrumentality—*see* Appellant's Br. 23, 24—

out of an abundance of caution we proceed to assure ourselves of our subject matter jurisdiction.

commercial, courts treat the entity as an agency or instrumentality—legally separate from the foreign state; if the core functions are governmental, courts treat the entity as a mere political subdivision—not legally separate from the foreign state. *Id.* at 153. While *Transaero* involved the FSIA's service of process provision, courts have similarly utilized the core functions test in the context of the FSIA's exceptions to immunity. *See, e.g., Garb v. Republic of Poland,* 440 F.3d 579, 594–95 (2d Cir.2006) (takings exception); *Roeder v. Islamic Republic of Iran,* 333 F.3d 228, 234–35 (D.C.Cir.2003) (terrorism exception); *Servaas Inc. v. Republic of Iraq,* No. 10–828–CV, 2011 WL 665334, at *2–3 (2d Cir. Feb. 16, 2011) (unpublished) (commercial activities exception).[12]

■ Following the lead of these opinions, we look to the core functions of IMOD. The core functions of IMOD—waging war and defending the state—are inherently governmental. *See, e.g., Transaero,* 30 F.3d at 153 ("[A]rmed forces are as a rule so closely bound up with the structure of the state that they must in all cases be considered as the 'foreign state' itself, rather than a separate 'agency or instrumentality' of the state."). Accordingly, we hold that for the purposes of the FSIA—including application of the com-

mercial activities exception—IMOD is a political subdivision of Iraq and thus Iraq and IMOD are legally one and the same. It follows that if Wye Oak's allegations would be sufficient to bring a claim against IMOD within the FSIA's commercial activities exception, those same allegations are also sufficient to bring a claim against Iraq within the FSIA's commercial activities exception.[13]

### B.

Having concluded that IMOD and Iraq are not legally separate, we now examine whether Wye Oak's allegations against Iraq—framed in terms of the activity of IMOD—are sufficient to bring Wye Oak's claim against Iraq within the FSIA's commercial activities exception. We conclude that they are.

The commercial activities exception provides:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state else-

---

**12.** *Servaas* involved facts very similar to those we encounter in this appeal. There the Second Circuit held that the acts of Iraq's Ministry of Industry were attributable to Iraq for the purposes of applying FSIA's commercial activity exception.

**13.** We believe our dissenting colleague has misapprehended the applicable law in contrasting "the *'Bancec'* analysis" with "the 'core functions' test." *See post* at 220 n. 5. Contrary to the dissent's implication, *Bancec* is not at odds with the core functions test and we could find no opinion that has so held. The Court in *Bancec* was not faced with the question of jurisdiction under the FSIA, to which the core functions test is aimed. In-

deed, if anything, the two inquiries appear to complement each other as they are both used to determine the separateness of government units, although in different contexts. *See Compagnie Noga D'Importation et D'Exportation, S.A. v. Russian Federation,* 361 F.3d 676, 687–88 (2d Cir.2004) (noting the similarity between the core functions test and the *Bancec* analysis). To that point, we observe that subsequent to the 5th Circuit case noted in the dissent as applying the *Bancec* analysis— *Walter Fuller Aircraft Sales, Inc. v. Republic of the Philippines,* 965 F.2d 1375 (5th Cir. 1992)—the 5th Circuit recognized the propriety of the core functions test. *See Magness,* 247 F.3d at 613 n. 7.

where; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a). To begin, because the provisions of the exception are disjunctive, only one need apply. Thus, if Wye Oak's claim against Iraq falls into one of these three exceptions, federal courts have subject matter jurisdiction to hear the claim. We note as well that the law requires a jurisdictional nexus: the commercial activity alleged by Wye Oak for the purpose of establishing jurisdiction must form the basis of the claim for which Wye Oak seeks relief on the merits. *See Gerding v. Republic of France*, 943 F.2d 521, 526 (4th Cir.1991).

■ Although the district court found that Wye Oak's claim fell within all three exceptions, we focus on the second: "an act performed in the United States in connection with a commercial activity of the foreign state elsewhere." 28 U.S.C. § 1605(a)(2). Relying on the contract, the letter addendum, and the allegations in its complaint, we conclude that Wye Oak has presented sufficient facts to support a reasonable inference that Iraq, through IMOD, engaged—pursuant to the contract—in the preparation for sale and sale of scrap metal in Iraq—a commercial activity. *See Saudi Arabia v. Nelson*, 507 U.S. 349, 360, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993) ("[A] foreign state engages in commercial activity ... where it acts 'in the manner of a private player within' the market." (quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992))). Wye Oak has also presented sufficient facts to support a reasonable inference that it performed acts in the United States (accounting, computer programming, contacting

agents of foreign nations, etc.) in connection with the scrap sale activities of IMOD in Iraq. Therefore, we conclude that Wye Oak has made a sufficient showing that its breach of contract claim is based upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere.

Iraq does not dispute that IMOD was engaged in the commercial activity of selling scrap or that Wye Oak performed the just described acts in the United States. Iraq instead challenges its jurisdictional nexus, asserting that Wye Oak has not presented sufficient facts to support an inference that the acts performed by it in the United States were performed *pursuant to the contract*. First, Iraq argues that the acts performed by Wye Oak in the United States were "administrative and back-office tasks" and those tasks were not part of the contract. Appellant's Br. 50. Iraq alternatively argues that even if the tasks were part of the contract, "Wye Oak agreed that any administrative work 'necessary' to perform the [contract] would be performed on-site in Iraq. Thus, [according to Iraq,] none of the alleged administrative and back-office tasks purportedly undertaken in the United States were within the actual scope of Wye Oak's work under the alleged contract." *Id.*

We disagree. First, many of the activities alleged by Wye Oak to have occurred in the United States—for example, the contacting of agents of foreign governments and the tracking of world scrap prices—go beyond administrative tasks and thus would fall under the contract even accepting Iraq's argument. Second, assuming such activities are administrative, we find no basis upon which to conclude that those tasks were *not* part of Wye Oak's performance under the contract. While the contract does make Wye Oak responsible for its own *costs* of per-

forming administrative activities, it does not follow that the contract excluded such activities. Indeed, the broad language of the contract and the letter addendum require Wye Oak to "use all reasonable commercial efforts . . . in the development of markets and sales prospects for Military equipment," J.A. 23, and commission Wye Oak "to inventory, assess and recover" equipment, J.A. 29. The so-called "administrative and back-office tasks" performed by Wye Oak were plausibly part of its "reasonable commercial efforts" and, further, were plausibly necessary to inventory and assess equipment.

Finally, we find no merit to Iraq's argument that "Wye Oak agreed that any administrative work 'necessary' to perform the [contract] would be performed on-site in Iraq." The provision Iraq refers to provides "office facilities for [Wye Oak] . . . at the various locations and sites [in Iraq] as *necessary* to perform the duties of [the contract]." J.A. 25 (emphasis added). Although this provision presumably made it easier for Wye Oak to perform its contractual duties in Iraq, we cannot plausibly interpret this provision to require that all work under the contract be performed in Iraq. Accordingly, we hold that Wye Oak's breach of contract is based upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere.

Therefore, we agree with the district court that the commercial activities exception to foreign sovereign immunity applies to Wye Oak's claim against Iraq for breach of contract, and, consequently, that Iraq is subject to the jurisdiction of U.S. courts.

## IV.

For the foregoing reasons, the holding of the district court is

*AFFIRMED.*

SHEDD, Circuit Judge, dissenting:

The appellant convinced the district court to transfer this case to another district court, in the District of Columbia. Having received the transfer, the appellant now appeals to this circuit court for a reversal of the original district court's decision not to dismiss the case for lack of subject matter jurisdiction. I would dismiss this appeal because under the rules governing jurisdiction in transferred cases, I do not think we have appellate jurisdiction. Accordingly, I respectfully dissent.

As the majority correctly notes, our appellate jurisdiction analysis begins with the general rule: when a case has been properly transferred (as here) by a district court, "the transferor court—and the appellate court that has jurisdiction over it—loses all jurisdiction over the case and may not proceed further with regard to it." 15 Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice & Procedure* § 3846 (4th ed.2007); *see also Wilson–Cook Medical, Inc. v. Wilson*, 942 F.2d 247, 250 (4th Cir.1991) (describing the general rule). However, as the majority also correctly notes, we have recognized an exception to this general rule. *See TechnoSteel, LLC v. Beers Constr. Co.*, 271 F.3d 151 (4th Cir.2001). The majority concludes that the reasoning that underlies the *TechnoSteel* exception should be applied broadly. I disagree. In my opinion, *TechnoSteel* is not a new general rule on transfer jurisdiction, but merely an exception to the general rule. I believe the reasoning of *TechnoSteel*, when understood in context, is inapposite, and therefore inapplicable, to the present appeal.

In *TechnoSteel*, we concluded that the transfer principles generally applicable to interlocutory decisions were "unsuitable in the quite different context of timely filed appeals from immediately appealable deci-

sions of our district courts." *Id.* at 154. In reaching that conclusion, we acknowledged that courts have adhered to the general rule that a transfer contemplates a plenary transfer of the entire case. *Id.* at 160. However, under the facts presented in *TechnoSteel,* we concluded that application of the general rule to immediately appealable decisions of the transferor court rendered the general rule "unworkable and unfair." *Id.*

Our decision in *TechnoSteel* was largely a pragmatic one, based in part on our desire to avoid "frantic appellate procedure[s]," such as racing to file an appeal before the file was transferred or seeking a retransfer from the transferee court before the time for appeal ran in the transferor court. *Id.* at 161. Perhaps more importantly, we also recognized, based on the specific facts in *TechnoSteel* and based on a review of the law of the transferee court,[1] that the transferee circuit would likely not review the decision. Thus, under the general rule, there would have been no appellate review available, and such a result would have been unfair. *Id.* at 160–61.

Those practical concerns are absent here. Admittedly, an order denying sovereign immunity (which determines the issue of subject matter jurisdiction) is an immediately appealable collateral order, which is required for the *TechnoSteel* exception.

However, while the presence of such an immediately appealable collateral order is necessary under *TechnoSteel,* such an order, alone, should not be sufficient to ignore our general rule. The underlying issue in this appeal is subject matter jurisdiction, and subject matter jurisdiction can be raised by either party, or *sua sponte* by the court, *at any time. See, e.g., In re Kirkland,* 600 F.3d 310, 314 (4th Cir.2010) ("Subject matter jurisdiction cannot be forfeited or waived, and can be raised by a party, or by the court *sua sponte,* at any time prior to final judgment."); *see also Athens Community Hosp., Inc. v. Schweiker,* 686 F.2d 989, 992 (D.C.Cir. 1982) (same). Further, a "federal court has an independent obligation to assess its subject-matter jurisdiction." *Constantine v. Rectors & Visitors of George Mason Univ.,* 411 F.3d 474, 480 (4th Cir.2005). Therefore, regardless of our decision on the question presented in this appeal— whether subject matter jurisdiction exists—the parties or the transferee court may at any time (and perhaps the court must, if it has any question about its authority in a case) re-address the issue of subject matter jurisdiction as this case proceeds there. Thus, this appeal based on the issue of subject matter jurisdiction does not implicate any of the practical problems the *TechnoSteel* decision sought to avoid.[2]

---

**1.** "The Eleventh Circuit Court of Appeals would not entertain an appeal from the South Carolina district court's denial of TechnoSteel's petition to compel arbitration." *TechnoSteel,* 271 F.3d at 156 (citing 28 U.S.C. § 1294(1); *Roofing & Sheet Metal Servs., Inc. v. La Quinta Motor Inns, Inc.,* 689 F.2d 982, 986 n. 5 (11th Cir.1982)).

**2.** *TechnoSteel* specifically dealt with a different jurisdictional context as well. *TechnoSteel* involved a district court's *discretionary* authority to transfer a case "[f]or the convenience of parties and witnesses, in the interest of justice" under 28 U.S.C. § 1404(a). Here,

because the district court found that Wye Oak failed to establish venue in the Eastern District of Virginia, the transfer was statutorily *required* under § 1391(f)(4). Accordingly, the district court transferred the case to the District of Columbia, which is the default venue for actions against foreign states. That finding has not been appealed by either party, and is therefore not before us. Thus, not only is venue improper in the district court below, but under the facts of this case, the federal courts in the District of Columbia are the only courts where venue is proper.

*TechnoSteel* also justified its exception to the general rule in transferring jurisdiction because under those facts the general rule would have been "unworkable and unfair." *TechnoSteel*, 271 F.3d at 160. Here, however, it is the application of the *TechnoSteel* exception which would make the result unfair and potentially unworkable. The majority's ruling would clearly create a tenuous situation if the courts in the District of Columbia were to find that subject matter jurisdiction does not exist. Astonishingly, this would create a circuit split on the *same case.* Moreover, the possibility of such differing views would encourage forum shopping when a party, with a case which does not have subject matter jurisdiction under the precedent of the appropriate circuit, could file in another circuit which is more likely to provide a favorable ruling. Surely, such litigation tactics should be discouraged. On the other hand, had the majority reversed the district court on the merits, we would remand this case to a district court which no longer has jurisdiction and in which venue is statutorily improper. To me, both of these results are unworkable.

Nor is the application of the general rule on transfer jurisdiction unfair in this case. To the contrary, it is the application of the *TechnoSteel* exception under these facts which is not fair. First, in *TechnoSteel,* the *defendant* sought a transfer, received it, and then sought to eliminate the *plaintiff's* appeal rights. Thus, the party whose transfer request was granted sought to eliminate the other party's rights. That clearly is unfair. In contrast, here the defendant sought and received a transfer and now appeals a separate adverse ruling in the case in an effort to win on the merits in this, the transferor circuit. While attempting to get this "first bite" of the apple in our circuit, the defendant is in no way prohibited from seeking a "second bite" in the District of Columbia (the transferee court) if he loses before us on the merits. To disallow this "double bite" strategy created by the defendant [3] is not unfair at all; rather, it would be unfair to subject the plaintiff to such a double appeal.

The majority apparently believes these problems concerning workability and fairness will be addressed by the law of the case doctrine. Such a view overstates that doctrine, especially in the context of subject matter jurisdiction. The law of the case "is a prudential rule rather than a jurisdictional one," *Crocker v. Piedmont Aviation, Inc.,* 49 F.3d 735, 739–40 (D.C.Cir.1995), and it "merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power." *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 817, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (quoting *Messinger v. Anderson,* 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152 (1912)) (internal quotation marks omitted). It "is not absolute nor inflexible." *Capital Invs. Co. v. Executors of Estate of Morrison,* 584 F.2d 652, 654 (4th Cir.1978). This is particularly true with regard to determinations of subject matter jurisdiction:

> [Law of the case] does not and cannot limit the power of a court to reconsider an earlier ruling. The ultimate responsibility of the federal courts, at all levels, is to reach the correct judgment under law. Though that obligation may be tempered at times by concerns of finality and judicial economy, nowhere is it

---

**3.** I agree with the majority that the district court could have taken steps—for example, staying the transfer pending our review of this appeal—to avoid the "somewhat anomalous circumstances" presented in this appeal. However, the Republic of Iraq also bears responsibility for the odd procedural posture.

greater and more unflagging than in the context of subject matter jurisdiction issues, which call into question the very legitimacy of a court's adjudicatory authority.

*American Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 515 (4th Cir.2003).[4]

Therefore, because the exceptional concerns addressed by *TechnoSteel* are not present in this case and because the application of *TechnoSteel* would lead to a result that is "unworkable and unfair," I find no reason to apply its exception. Accordingly, because the case has been properly transferred, I believe we are divested of jurisdiction to review this appeal.[5]

---

**4.** The only time law of the case would prevent revisiting subject matter jurisdiction would occur when a superior court had decided the issue and then the case was placed back before a lower court over which the superior court had binding authority. That scenario is not present here.

**5.** Even if we had appellate jurisdiction in this case, I would decline to exercise it for prudential reasons in order to avoid the problems—real and potential—which would be created by our ruling on the merits of this appeal. *See, e.g., Qingyun Li v. Holder*, 666 F.3d 147 (4th Cir.2011) (finding jurisdiction over an immediately appealable order from the Board of Immigration Appeals but nonetheless declining to exercise jurisdiction for prudential reasons). The majority's approach is particularly troubling where, as here, courts have differed on the appropriate standard to use when analyzing the question of subject matter jurisdiction with regard to the Foreign Sovereign Immunity Act ("FSIA"). *Compare Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 151 (D.C.Cir.1994)

(adopting the "core functions" test), *with First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) (*"Bancec"*), *and Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines*, 965 F.2d 1375 (5th Cir.1992) (relying on the *Bancec* analysis). Thus, it seems especially prudent to leave a determination on subject matter jurisdiction to the circuit which unarguably has jurisdiction over the case in order for that circuit to apply its own relevant precedent. This is not because the "law or facts involved are complicated or unsettled," *ante* at 211, but for reasons of comity. Recognition of this principle of comity underlies other federal jurisdiction doctrines. *See, e.g., Martin v. Stewart*, 499 F.3d 360, 363 (4th Cir.2007) (noting the principle of comity underscores abstention doctrines); *see also Pacesetter Sys., Inc. v. Medtronic, Inc.*, 678 F.2d 93, 94 (9th Cir.1982) (noting the generally recognized doctrine of federal comity underscores the first-to-file rule); *Ellicott Mach. Corp. v. Modern Welding Co., Inc.*, 502 F.2d 178, 180 n. 2 (4th Cir.1974) (applying the "first to file" rule).