**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 17-1041**

───────────────

BAE SYSTEMS TECHNOLOGY SOLUTION & SERVICES, INC.,

Plaintiff - Appellee,

v.

REPUBLIC OF KOREA'S DEFENSE ACQUISITION PROGRAM ADMINISTRATION; REPUBLIC OF KOREA,

Defendants - Appellants.

------------------------------

UNITED STATES OF AMERICA,

Amicus Curiae.

───────────────

**No. 17-1070**

───────────────

BAE SYSTEMS TECHNOLOGY SOLUTION & SERVICES, INC.,

Plaintiff - Appellant,

v.

REPUBLIC OF KOREA'S DEFENSE ACQUISITION PROGRAM ADMINISTRATION; REPUBLIC OF KOREA,

Defendants - Appellees.

------------------------------

UNITED STATES OF AMERICA,

Amicus Curiae.

─────────────

Appeals from the United States District Court for the District of Maryland, at Greenbelt. Paul W. Grimm, District Judge.  (8:14-cv-03551-PWG)

─────────────

Argued:  October 24, 2017                    Decided:  March 6, 2018
                    Amended:  March 27, 2018

─────────────

Before MOTZ, KEENAN, and THACKER, Circuit Judges.

─────────────

Affirmed by published opinion.  Judge Motz wrote the opinion, in which Judge Keenan and Judge Thacker joined.

─────────────

**ARGUED:** Danny Christopher Onorato, SCHERTLER & ONORATO, LLP, Washington, D.C., for Appellants/Cross-Appellees.  Gregory Michael Williams, WILEY REIN LLP, Washington, D.C., for Appellee/Cross-Appellant.  **ON BRIEF:** Robert J. Spagnoletti, SCHERTLER & ONORATO, LLP, Washington, D.C.; Jason D. Wallach, BLANK ROME LLP, Washington, D.C., for Appellants/Cross-Appellees.  Richard W. Smith, Ari S. Meltzer, Katherine C. Campbell, Scott A. Felder, WILEY REIN LLP, Washington, D.C., for Appellee/Cross-Appellant.  Chad A. Readler, Acting Assistant Attorney General, Sharon Swingle, Benjamin M. Shultz, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Stephen M. Schenning, Acting United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Amicus Curiae.

─────────────

DIANA GRIBBON MOTZ, Circuit Judge:

These appeals arise from a contract dispute between a United States defense contractor, BAE Systems Technology Solutions & Services, Inc. (BAE), and the Republic of Korea and its Defense Acquisition Program Administration (collectively Korea). BAE sought a declaratory judgment that it had not breached any contractual obligation to Korea and a permanent injunction barring Korea from prosecuting its suit against BAE in Korean courts. The district court granted BAE the requested declaration but refused to issue a permanent anti-suit injunction. Korea appeals, and BAE cross-appeals. For the reasons that follow, we affirm.

I.

A.

The Arms Export Control Act (AECA), 22 U.S.C. §§ 2751 *et seq.*, authorizes the Executive Branch to engage in Foreign Military Sales (FMS) transactions when selling certain U.S. military goods or services to a foreign government. This dispute centers on such a transaction between the United States and Korea.[1]

In an FMS transaction, the foreign sovereign contracts with the U.S. government through a Letter of Offer and Acceptance. The U.S. government then contracts with a U.S. contractor for the goods or services that the U.S. government will eventually resell

---

[1] For present purposes, the term "FMS transaction" refers to the purchase by the U.S. government of goods or services from U.S. contractors and subsequent resale to a foreign government, as authorized under 22 U.S.C. § 2762(a). Not implicated in this case are U.S. government sales from existing government stocks authorized under § 2761.

3

to the foreign sovereign. *See* 28 U.S.C. § 2762. Under the FMS structure, the U.S. contractor is "directly obligated" to the U.S. government and "has no direct contractual relationship" with the foreign government. Def. Inst. of Sec. Cooperation Studies, *The Management of Security Cooperation* (*Green Book*) 9-3 (37.1 ed. May 2017).[2] For that reason, this dual-contract structure precludes the foreign sovereign from directly suing the U.S. contractor for its performance on an FMS contract. *See Sec'y of State for Defence v. Trimble Nav. Ltd.*, 484 F.3d 700, 707 (4th Cir. 2007).

The FMS structure also permits the U.S. government to exercise significant control over the transaction. Once the two sovereigns agree on the terms of sale, the foreign sovereign must "trust[]" the U.S. government "to negotiate a contract [with a U.S. contractor] that will meet [the foreign government's] needs." *Green Book* at 15-8. The U.S. government "determines the contract type, selects the contract source, and negotiates prices and contract terms with individual contractors." *Id.* Importantly here, in an FMS transaction, the U.S. government retains control over price. Although the sovereign-to-sovereign agreement contains an initial price estimate, the foreign government must pay whatever the U.S. government contends the transaction costs — even if that amount exceeds the previous estimate. *See* Def. Sec. Cooperation Agency,

---

[2] The Green Book is a textbook published by the Defense Institute of Security Cooperation Studies (DISCS), a part of the Department of Defense (DoD) that provides research support to advance U.S. foreign policy through security assistance and cooperation. "It does not set policy, precedent, or procedures," but rather "describes them." *Resources: Publications*, DISCS, Def. Sec. Cooperation Agency, http://www.discs.dsca.mil/_pages/resources/default.aspx?section=publications&type=gre enbook (last visited February 15, 2018).

4

U.S. Dep't of Def., *Security Assistance Management Manual* (*SAMM*), Fig. C5.F4 § 4.4.1, http://www.samm.dsca.mil (last visited February 9, 2018). In sum, the FMS structure provides advantages and disadvantages for a foreign purchaser. One potential advantage is that, in an FMS transaction, the foreign purchaser benefits from the U.S. government's procurement expertise. *See Green Book* at 15-7, 15-8. One disadvantage, however, is the loss of control over several aspects of the transaction.

In most instances, a foreign sovereign may choose whether to procure goods and services through the FMS structure or whether to purchase them directly from the U.S. contractor through a Direct Commercial Sales (DCS) transaction. For military sales it deems particularly sensitive, however, the U.S. government requires the use of the FMS structure. *See Trimble*, 484 F.3d at 710 (noting the President has discretion to designate which military items must be sold exclusively through FMS channels); *SAMM* at § C4.3.5 ("The AECA gives the President discretion to designate which military end-items must be sold exclusively through FMS channels. This discretion is delegated under statutory authority to the Secretary of State. Generally, as a matter of policy, this discretion is exercised upon the recommendation of DoD.").[3]

Although in an FMS transaction the foreign government and U.S. contractor do not contract directly, the foreign sovereign and U.S. contractor may coordinate in advance of the government-to-government talks in an attempt to pre-determine the

---

[3] "Unless an item has been designated as 'FMS Only,' DoD is generally neutral as to whether a country purchases U.S.-origin defense articles or services commercially [*i.e.*, through a DCS transaction] or through FMS channels." *SAMM* at § C4.3.4.

contents of the eventual government-to-government agreement. Before submitting its FMS purchase request to the U.S. government, for instance, a foreign sovereign may negotiate proposed pricing and technical specifications with a favored U.S. contractor and then urge the U.S. government to provide a sole source award to that contractor under the pre-negotiated terms. But the U.S. government need not agree to do so.

The dual-contract structure of an FMS transaction has important implications for resolving legal disputes. The foreign sovereign cannot directly sue the U.S. contractor for its performance on an FMS contract. Nor can the two sovereigns sue each other for failure to perform on the government-to-government contract: their only recourse is to hold bilateral consultations. *SAMM* at Fig. C5.F4 § 7.2.

B.

In 2011, Korea announced its intention to upgrade its fighter planes. Because this upgrade program required Korea to obtain sensitive military technology, the U.S. government barred Korea from purchasing directly from U.S. contractors through a direct purchase DCS transaction and instead required Korea to procure the desired goods and services through an FMS transaction.

In preparation for this FMS transaction, Korea solicited bids from U.S. defense contractors, including BAE, as to the cost of providing the desired upgrades. BAE responded and issued successive Letters of Guarantee to Korea. In those letters, BAE agreed to pay Korea $43.25 million if BAE failed to "respond timely to the evaluation formalities of the bidder's qualification," assuming BAE was "designated as an eligible bidder," *or* if BAE failed to execute a contract with Korea after Korea awarded its bid to

6

BAE. BAE issued the first Letter of Guarantee in late 2011; soon thereafter, Korea selected BAE as its favored contractor for the upgrade program. In the ensuing years, BAE renewed its Letter of Guarantee several times, including in 2013 and 2014.

Given the dual-contract structure in an FMS transaction, Korea and BAE attempted to pre-negotiate key aspects of the inter-governmental talks. They agreed on what Korea would request from the U.S. government and at what price. BAE promised to "put forth its best effort" to convince the U.S. government to agree to those terms. In exchange, Korea promised to recommend BAE as its favored contractor to supply the requested goods and services to the U.S. government.

On August 1, 2012, BAE and Korea memorialized their understandings in a Memorandum of Agreement. That BAE-Korea agreement authorized Korea to demand payment of the $43.25 million promised in the Letters of Guarantee if (1) BAE failed to use its "best effort" to secure the terms specified in the BAE-Korea agreement in the separate agreement between the U.S. and Korean governments, and (2) BAE's failure to use its "best effort" delayed conclusion of the government-to-government negotiations. The BAE-Korea agreement also contains a forum selection clause, which provides that any dispute between BAE and Korea "shall be resolved through a litigation and the Seoul Central Court shall hold jurisdiction." Finally, the BAE-Korea agreement provides that it "automatically terminate[s]" upon execution of an FMS agreement between the U.S. and Korean governments.

Korea then sent its formal purchase request to the U.S. government, initiating the FMS government-to-government negotiations. In December 2013, the two sovereigns

7

signed an initial FMS agreement that covered preliminary issues and anticipated a "follow-on amendment" to execute the core of the FMS transaction. With respect to the anticipated follow-on amendment, the U.S. government initially signaled it could meet Korea's budget but later informed Korea that the price tag of the FMS transaction would greatly exceed initial estimates. BAE, as the contractor chosen to provide the requested goods and services, had participated in inter-governmental discussions related to price. After the U.S. government raised its overall price estimate, Korea charged that BAE had breached the BAE-Korea agreement by failing to use its best efforts to ensure the U.S. government agreed to the price that Korea and BAE had worked out in advance. BAE steadfastly denied this, explaining that the U.S. government increased its price for reasons having nothing to do with BAE and despite its best efforts. Nonetheless, Korea demanded that BAE pay $43.25 million pursuant to the BAE-Korea agreement.

BAE then filed this action in federal court, seeking a declaration that it had not breached any obligations to Korea. After the court denied Korea's motion to dismiss, Korea answered the complaint and asserted a number of cross-claims against BAE. Korea also initiated a suit in a Korean court to litigate essentially the same issues. The district court issued the requested declaratory judgment to BAE but refused to enjoin the litigation in Korea. This timely appeal followed.

II.

Korea initially grounds its appeal in the forum selection clause contained in the BAE-Korea agreement. That forum selection clause provides that any dispute arising

8

from or relating to the BAE-Korea agreement "shall be resolved through a litigation and the Seoul Central District Court shall hold jurisdiction." Korea claims this is a mandatory forum selection clause, requiring all litigation to occur in Korea, and thus requires dismissal of BAE's suit. BAE maintains that it is permissive, providing that Seoul, Korea is an appropriate forum for litigation, but not barring litigation elsewhere.

A.

Although the parties agree that we consider this question *de novo*, and we traditionally have done so, the more deferential, abuse-of-discretion standard of review may be appropriate in light of *Atlantic Marine Construction Co. v. U.S. District Court*, 134 S. Ct. 568 (2013).[4] We need not resolve the correct standard of review here, however, because the result remains the same under both standards of review.

---

[4] We have treated motions to dismiss based on a forum selection clause as motions to dismiss for improper venue under Fed. R. Civ. P. 12(b)(3) and reviewed *de novo* dismissal of a complaint on the basis of a forum selection clause. *See, e.g.*, *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 365–66 (4th Cir. 2012). But in *Atlantic Marine*, the Supreme Court clarified that a party may not seek to enforce a forum selection clause by moving to dismiss for improper venue; instead, "the appropriate way to enforce a forum-selection clause pointing to a . . . foreign forum is through the doctrine of *forum non conveniens*." 134 S. Ct. at 580. In cases not involving forum selection clauses, we have reviewed dismissals pursuant to the doctrine of *forum non conveniens* for abuse of discretion. *See, e.g.*, *DiFederico v. Marriott Int'l, Inc.*, 714 F.3d 796, 799 (4th Cir. 2013). *Atlantic Marine* thus raises the question of which standard of review applies here — abuse of discretion (as is typical in *forum non conveniens* cases), *de novo* (as is typical when reviewing dismissals based on forum selection clauses), or some combination of both. Our sister circuits have taken varying approaches. *See Weber v. PACT XPP Techs., AG*, 811 F.3d 758, 768 (5th Cir. 2016) (mixed standard of review); *Martinez v. Bloomberg LP*, 740 F.3d 211, 217 (2d Cir. 2014) (not deciding the question).

As a general matter, courts enforce forum selection clauses unless it would be unreasonable to do so. *See M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972). This presumption of enforceability, however, only applies if the forum selection clause is mandatory rather than permissive. *See Albemarle Corp. v. AstraZeneca UK Ltd.*, 628 F.3d 643, 650–51 (4th Cir. 2010). A mandatory clause requires litigation to occur in a specified forum; a permissive clause permits litigation to occur in a specified forum but does not bar litigation elsewhere. *Id.* A permissive forum selection clause does not justify dismissal on the grounds that the plaintiff filed suit in a forum other than the one specified in the clause. *See, e.g.*, *Weber v. PACT XPP Techs., AG*, 811 F.3d 758, 768 (5th Cir. 2016).

In *Atlantic Marine*, the Supreme Court held that a defendant seeking to enforce a forum selection clause that points to a foreign forum should move to dismiss pursuant to the common-law doctrine of *forum non conveniens*. *See* 134 S. Ct. at 580.[5] This doctrine allows a court to dismiss a case when the original venue is highly inconvenient and an adequate alternative venue exists. In the typical case, the defendant invoking *forum non conveniens* "bears a heavy burden in opposing the plaintiff's chosen forum." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Co.*, 549 U.S. 422, 430 (2007). In particular, the defendant must prove that an alternative forum is available, adequate, and more

---

[5] Although the *Atlantic Marine* Court clarified that the "appropriate way" to enforce such a forum selection clause is through *forum non conveniens*, it left open the question of whether a defendant could obtain dismissal under Fed. R. Civ. P. 12(b)(6). 134 S. Ct. at 580 & n.4.

convenient (in light of the public and private interests involved) than the forum selected by the plaintiff. *See DiFederico v. Marriott Int'l, Inc.*, 714 F.3d 796, 800–01 (4th Cir. 2013).

But that framework is modified, the *Atlantic Marine* Court explained, in the context of a valid forum selection clause. Most importantly, a forum selection clause reverses the presumptions that would otherwise apply: instead of heavily favoring the plaintiff's chosen forum and placing the burden on the defendant, the forum selection clause is "given controlling weight in all but the most exceptional cases," and the plaintiff bears the burden of proving why it should not be enforced. *See* 134 S. Ct. at 581, 583 & n.8 (internal quotation marks and citation omitted).[6] *Atlantic Marine* thus "reaffirms *Bremen*'s identification of a strong federal public policy supporting the enforcement of forum selection clauses," even in the context of *forum non conveniens* analysis. *See Martinez*, 740 F.3d at 219.

Although the *Atlantic Marine* Court did not expressly hold that only a mandatory forum selection clause modifies the *forum non conveniens* framework, the Court's rationale makes clear that this is so. *See* 134 S. Ct. at 581–82 (suggesting the modified

---

[6] The forum selection clause in *Atlantic Marine* pointed to another domestic forum rather than (as here) a forum abroad. For that reason, the *Atlantic Marine* Court centered its analysis on 28 U.S.C. § 1404(a), pursuant to which a district court may transfer a civil action to another district, and held a valid forum selection clause modified the framework for considering a § 1404(a) motion to transfer. However, the *Atlantic Marine* Court suggested the traditional analysis under both § 1404(a) and *forum non conveniens* (where no forum selection clauses are at issue) is similar. *See* 134 S. Ct. at 581 & n.6. It also made clear the *forum non conveniens* framework must be modified in the same manner in the presence of a forum selection clause. *See id.* at 583 n.8.

11

framework applies "when a plaintiff agrees by contract to bring suit *only* in a specified forum" (emphasis added)); *id.* at 583 n.8 (modified framework applies "when the plaintiff has violated a contractual obligation by filing suit in" another forum). Our sister circuits appear to have reached the same conclusion. *See Weber*, 811 F.3d at 768, 775–76 (under *Atlantic Marine*, a "mandatory" forum selection clause modifies the *forum non conveniens* framework that would otherwise apply); *GDG Acquisitions, LLC v. Gov't of Belize*, 749 F.3d 1024, 1029–30 (11th Cir. 2014) (suggesting *Atlantic Marine* does not apply in the context of permissive clauses); *cf. Claudio-De Leon v. Sistema Universitario Ana G. Mendez*, 775 F.3d 41, 46 (1st Cir. 2014) (noting in a post-*Atlantic Marine* decision that "the threshold question in interpreting a forum selection clause is whether the clause at issue is permissive or mandatory" (internal quotation marks and citation omitted)); *Martinez*, 740 F.3d at 216–17, 227 (discussing *Atlantic Marine* and concluding that only "mandatory" clauses are presumably enforceable). This conclusion also accords with the longstanding notion that only mandatory forum selection clauses enjoy a presumption of enforceability. *See Albemarle Corp.*, 628 F.3d at 650–51.

Accordingly, determination of whether the forum selection clause here is permissive or mandatory is critical. If it is mandatory, then *Atlantic Marine* controls and BAE bears the burden of proving why it should not be enforced. If it is permissive, then the traditional *forum non conveniens* analysis applies and Korea bears a "heavy burden" in opposing BAE's alternative forum.

12

B.

A forum selection clause is permissive unless it contains "specific language of exclusion." *See Albemarle Corp.*, 628 F.3d at 651 (quoting *IntraComm, Inc. v. Bajaj*, 492 F.3d 285, 290 (4th Cir. 2007)) (internal quotation marks omitted). "[A]n agreement *conferring* jurisdiction in one forum will not be interpreted as *excluding* jurisdiction" in another unless the clause expressly sets forth "specific language of exclusion." *IntraComm*, 492 F.3d at 290 (quoting *John Boutari & Son, Wines & Spirits, S.A. v. Attiki Imps. & Distribs., Inc.*, 22 F.3d 51, 53 (2d Cir. 1994)) (internal quotation marks omitted).

The forum selection clause at issue here does not contain any "specific language of exclusion." *Id*. Rather, it simply confers jurisdiction on a forum by stating that disputes "shall be resolved through a litigation and the Seoul Central Court shall hold jurisdiction." This clause, as the district court noted, differs significantly from forum selection clauses found to be mandatory, which provide that a particular place constitutes the "sole" or "only" or "exclusive" forum.

Contrary to Korea's suggestion, the use of "shall" in the clause does not render it mandatory. As we explained in *IntraComm*, the use of "shall" in a forum selection clause is not dispositive, because, in context, the clause may still "permit[] jurisdiction in one court but . . . not prohibit jurisdiction in another." *Id.* (discussing *Excell, Inc. v. Sterling Boiler & Mech., Inc.*, 106 F.3d 318, 321 (10th Cir. 1997)). Nor does holding the clause permissive render it, as Korea suggests, "meaningless and redundant." Appellant's Opening Br. at 30. Korea contends this is so because the BAE-Korea agreement "could always be enforced in the Korean courts." *Id.* at 29–30. But Korea fails to explain why

13

the Seoul Central District Court in particular would necessarily hold jurisdiction absent this clause.[7]

Because the clause here is permissive, the modified framework outlined in *Atlantic Marine* does not apply, there is no presumption in favor of enforceability, and we proceed with a traditional *forum non conveniens* analysis. Pursuant to that analysis, Korea bears the burden of proving, *inter alia*, that its proposed alternative forum (the Seoul Central District Court) is more convenient in light of the public and private interests involved. *See DiFederico*, 714 F.3d at 800–01. Korea does not even attempt to do this. Accordingly, we agree with the district court that the BAE-Korea agreement's permissive forum selection clause provides no basis for dismissing this action.

## III.

Korea also contends that the district court erred in refusing to accord it immunity from suit under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 *et seq.* (FSIA). That statute provides that "a foreign state shall be immune from the jurisdiction of the

---

[7] Korea's heavy reliance on *Sterling Forest Assocs. v. Barnett-Range Corp.*, 840 F.2d 249 (4th Cir. 1988), *overruled on other grounds by Lauro Lines S.R.L. v. Chasser*, 490 U.S. 495 (1989), is misplaced. In that case, we found mandatory a very different clause that stated, "the parties agree that in any dispute jurisdiction *and* venue shall be in California." *Id.* at 250–52 (emphasis added). As other circuits have explained, "where venue is specified with mandatory or obligatory language, the clause will be enforced; where only jurisdiction is specified, the clause will generally not be enforced unless there is some further language indicating the parties' intent to make venue exclusive." *Paper Express, Ltd. v. Pfankuch Maschinen GmbH*, 972 F.2d 753, 757 (7th Cir. 1992); *accord K & V Sci. Co. v. BMW*, 314 F.3d 494, 499 (10th Cir. 2002).

courts of the United States" unless one of the enumerated exceptions applies.[8]  28 U.S.C. § 1604.  BAE maintains that the district court properly exercised jurisdiction, because two FSIA exceptions apply here: the waiver exception and the commercial activity exception.  We review applications of the FSIA *de novo*.  *Wye Oak Tech., Inc. v. Republic of Iraq*, 666 F.3d 205, 212 (4th Cir. 2011).

The FSIA waiver exception states:

> A foreign state shall not be immune from the jurisdiction of courts of the United States . . . in any case . . . in which the foreign state has waived its immunity either explicitly *or by implication*, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver . . . .

28 U.S.C. § 1605(a)(1) (emphasis added).

"Waiver under the FSIA is rarely accomplished by implication," and "the implicit waiver provision of § 1605(a)(1) must be construed narrowly."  *See In re Tamimi*, 176 F.3d 274, 278 (4th Cir. 1999).  In enacting the FSIA, however, Congress provided three examples of implicit waivers.  *See* H.R. Rep. No. 94-1487, at 18 (1976), *as reprinted in* 1976 U.S.C.C.A.N.  6604, 6617; S. Rep. No. 94-1310, at 17–18 (1976).  These three examples "involve circumstances in which the implicit waiver is unmistakable" and so the FSIA exception applies.  *See Tamimi*, 176 F.3d at 278–79.  One of these unmistakable

---

[8] The parties do not dispute that both the Republic of Korea and its Defense Acquisition Program Administration (its instrumentality) are "foreign states" within the meaning of the FSIA.  We agree.  *See* 28 U.S.C. § 1603 (defining "foreign state" under the FSIA).

15

implicit waivers occurs when "a foreign state has filed a responsive pleading in a case without raising the defense of sovereign immunity." *Id.* at 278.

BAE initiated this lawsuit against Korea in November 2014. Korea moved to dismiss the action in September 2015 but did not raise the sovereign immunity defense in that motion. On February 18, 2016, after the district court denied Korea's motion to dismiss, Korea filed an answer to BAE's complaint and several counter-claims against BAE. This was Korea's first responsive pleading. *See* Fed. R. Civ. P. 7 (an answer to a complaint is a "pleading," but a motion to dismiss is not); 28 U.S.C. § 1608(d) (outlining timeline under FSIA for a foreign state to file "an answer or other responsive pleading"). In this initial pleading, Korea failed to assert sovereign immunity but instead asserted counter-claims against BAE for breach of contract, fraud, and negligent misrepresentation. In sum, by February 18, 2016, this litigation had been ongoing for over a year, Korea had not asserted a sovereign immunity defense, and Korea had filed a responsive pleading in the form of an answer and counter-claims. It thus appears that Korea impliedly waived its sovereign immunity defense.

Resisting this conclusion, Korea notes that it filed an amended answer and counter-claims on March 10, 2016, in which it did refer to FSIA. Korea added the following sentence in its amended answer and counter-claims:

> Moreover, Defendants deny that the act upon which BAE TSS bases its claim — Defendants' demand for payment of the amount of the bid bond required by Korean law — falls within the commercial activities exception of the Foreign Sovereign Immunities Act.

16

Although it referred to the FSIA in this amended answer and counter-claims, even then Korea did not raise the FSIA as an affirmative defense. Rather, Korea simply denied engaging in commercial activity under the FSIA.

Even assuming this statement in the amended answer sufficed to invoke FSIA protections, Korea cannot defeat a holding of implied waiver unless its amended answer and counter-claims rendered its initial answer and counter-claims irrelevant. Korea contends that this is the case, because an amended pleading generally supersedes the original, rendering the original of no legal effect. *See* Appellants/Cross-Appellees Response/Reply Br. at 32–33 (citing *Young v. City of Mount Ranier*, 238 F.3d 567, 572 (4th Cir. 2001)). Regardless of the ordinary effect of an amended answer on the original answer, a court cannot ignore the original answer for FSIA waiver purposes.

Korea's proposed interpretation — that only the latest amended answer matters for purposes of asserting sovereign immunity under FSIA — stands in tension with the statutory text, which states that a foreign state cannot withdraw an implied waiver once it is made. *See* 28 U.S.C. § 1605(a)(1); *see also Flota Maritima Browning de Cuba, S.A. v. Motor Vessel Ciudad de la Habana*, 335 F.2d 619, 621, 625 (4th Cir. 1964) (in pre-FSIA case, finding that Cuba waived its immunity "when it filed answers . . . without suggesting its immunity," because "once the immunity is waived . . . it cannot be revived"). Korea's interpretation could lead to absurd results, where a foreign state could avoid implied waiver simply by obtaining permission from a court to file an amended pleading.

We reject such an interpretation. Instead, we hold, as our sister circuits have, that filing a responsive pleading generally provides the last opportunity to assert sovereign immunity. *See Haven v. Polska*, 215 F.3d 727, 731 (7th Cir. 2000) ("If a sovereign files a responsive pleading without raising the defense of sovereign immunity, then the immunity defense is waived."); *Drexel Burnham Lambert Grp. Inc. v. Comm. of Receivers for Galadari*, 12 F.3d 317, 326 (2d Cir. 1993) ("[T]he filing of a responsive pleading is the *last chance* to assert FSIA immunity if the defense has not been previously asserted."); *Canadian Overseas Ores Ltd. v. Compania de Acero del Pacifico S.A.*, 727 F.2d 274, 277 (2d Cir. 1984) (describing a responsive pleading as "the point of no return for asserting foreign sovereign immunity"); *cf. Princz v. Republic of Germany*, 26 F.3d 1166, 1174 (D.C. Cir. 1994) ("[A]n implied waiver depends upon the foreign government's having *at some point* indicated its amenability to suit." (emphasis added)).[9]

Here, Korea participated in the litigation for over a year, including by filing a motion to dismiss and a responsive pleading, without giving any indication it asserted sovereign immunity. For that reason, it waived its immunity defense, and the district court had jurisdiction. The fact that Korea never "raise[d] the defense of sovereign

---

[9] In an earlier case, the D.C. Circuit rejected claims of implicit waiver when Iran failed to assert immunity in its initial answer but then asserted immunity in a subsequent answer. *See Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 442–44 (D.C. Cir. 1990). However, the court stressed the unusual nature of that case, where the first answer did not respond substantively to the complaint but rather noted the complaint must proceed in another forum, which it then did. *See id.* at 443.

immunity," even in its amended answer and counter-claims, but rather only asserted its actions did not qualify for the commercial activity exception, supports this conclusion.[10]

IV.

Although Korea largely relies on its forum selection clause and immunity arguments, it also challenges on the merits the grant of summary judgment to BAE. The district court concluded that Korea had no cause of action for an asserted breach of the BAE-Korea agreement. We review the district court's grant of summary judgment *de novo*. *Aikens v. Ingram*, 811 F.3d 643, 647 (4th Cir. 2016).

A.

We briefly recap the undisputed facts underlying this claim. When Korea sought to upgrade the avionics systems of its fleet of fighter planes, the United States insisted that this upgrade could only occur through an FMS transaction, in which the U.S. government retained control over price. Perhaps in recognition of the U.S. government's complete control over the FMS contract, Korea attempted to pre-determine its costs. To that end, Korea entered into an agreement with BAE in which, in exchange for being named as Korea's preferred contractor, BAE agreed to put forth its "best effort" to ensure the pricing to which BAE and Korea had agreed was accepted by the United States and included in the agreement between the two governments. Although the United States and Korea entered into a preliminary FMS contract, negotiations between them ultimately

_____

[10] Because we agree with BAE that the waiver exception applies, we do not consider the commercial activity exception.

19

collapsed due to price differences. Korea claims that BAE did not use its best efforts to ensure the U.S. government agreed to the price that BAE and Korea had worked out in advance. BAE maintains that the U.S. government increased its cost estimate based on "historical experience" with "previous F-16 upgrade programs" and that "no part of this cost increase was the result of [BAE's] actions." Appellee/Cross-Appellant's Response/Opening Br. at 15. The principal issue for declaratory judgment purposes, however, is not whether BAE failed to use its best efforts to advocate for a certain price, but rather whether Korea can enforce its agreement with BAE (including this "best effort" obligation) in light of U.S. national security interests.

We agree with the parties that this question turns on the relationship between the BAE-Korea agreement and the FMS transaction and whether enforcement of the BAE-Korea agreement would impact U.S. national security interests. Korea claims that the BAE-Korea agreement relates to, but is entirely distinct from, the FMS transaction. According to Korea, its agreement with BAE imposes obligations on BAE and Korea that have "no impact on the U.S. government or its national security." Appellant's Opening Br. at 49. BAE maintains that because the BAE-Korea agreement is intimately linked to the government-to-government transaction and purports to influence its outcome, it impacts U.S. national security and so is unenforceable. Appellee/Cross-Appellant's Response/Opening Br. at 28.

In *Trimble*, we explained that, where the U.S. government mandates use of the FMS format (as opposed to a direct purchase by a foreign government from a U.S. contractor via the DCS process), that requirement "reflects the national security interests

20

of the United States." 484 F.3d at 707. We reasoned that a foreign state will not be permitted "to gain an advantage of the DCS program in a situation where United States policy (and the statutory scheme chosen to effectuate that policy) explicitly precludes a DCS arrangement." *See id.* We thus concluded that a foreign state participating in an FMS transaction cannot sue the U.S. contractor under the theory that the foreign state is a third-party beneficiary of the contract between the U.S. government and the U.S. contractor. Recognizing such a cause of action "would allow the foreign purchaser to hold the contractor directly liable for the purchased goods, a level of accountability that may be achieved [only] through a DCS sale." *Id.*

In sum, *Trimble* teaches that a foreign state cannot sue a U.S. contractor if doing so would undermine the FMS structure and afford the foreign state advantages only available in a direct purchase DCS transaction between a foreign state and a U.S. contractor.

The district court concluded that Korea's lawsuit would do just that. The court reasoned that the BAE-Korea agreement is "inextricably intertwined" with the FMS transaction. In reaching this conclusion, it relied on the fact that the explicit purpose of the BAE-Korea agreement was to establish the technical specifications and prices that BAE would then support for inclusion in Korea's eventual FMS agreement with the U.S. government. If BAE failed to adequately advocate for inclusion of those terms in an inter-governmental deal, and that failure delayed conclusion of such a deal, the BAE-Korea agreement subjected BAE to "punishment" in the form of a $43.25 million payment. And, as the district court noted, the BAE-Korea agreement "automatically

21

terminate[d]" once the two governments reached an FMS agreement. Given these facts, we agree that the BAE-Korea agreement is intimately linked to the FMS transaction: in essence, it subjects BAE to potential liability if Korea is dissatisfied with developments in the government-to-government FMS negotiations.

B.

If enforced as Korea seeks, the BAE-Korea agreement would undermine the FMS structure in two critical ways. First, it would undermine the FMS dispute settlement provisions. The FMS structure strictly circumscribes the availability of litigation. A foreign state cannot sue the United States for failure to perform pursuant to the sovereign-to-sovereign agreement, including with respect to price. The foreign state's only recourse is to consult with the U.S. government. *See SAMM* Fig. C5.F4 § 7.2. Nor can a foreign state sue the U.S. contractor retained by the U.S. government to fulfill an FMS contract, because the foreign state does not contract directly with that contractor for the goods and services the contractor ultimately supplies (via the U.S. government) to the foreign state. *See Trimble*, 484 F.3d at 707. The FMS structure thus shields a U.S. contractor, such as BAE, from liability. Pursuant to the separate BAE-Korea agreement, Korea nonetheless seeks to impose liability on BAE for allegedly failing to use best efforts to prevent a price increase by the U.S. government in FMS government-to-government negotiations. Permitting Korea to impose such liability would run counter to the FMS structure.

Second, enforcement of the BAE-Korea agreement would undermine the control the United States retains in all FMS transactions over price. Under federal law, the foreign state must pay whatever it costs the U.S. government to supply the requested

22

goods or services. *See* 22 U.S.C. § 2762(a) (authorizing President to engage in FMS transactions if the foreign government agrees "to pay the full amount of such contract which will assure the United States Government against any loss on the contract"); *see also SAMM* § C9.3.1 (noting that, subject to certain exceptions identified in the AECA, "[t]he FMS program must be managed at no cost to the [U.S. government]").

Relatedly, in an FMS transaction, the U.S. government also retains control over negotiations with the U.S. contractor, including with respect to price. *See* Defense Federal Acquisition Regulations Supplement (DFARS), 48 C.F.R. §§ 1–99, 200–299, 225.7303(a) (The U.S. government "[p]rice[s] FMS contracts"). The United States even decides whether and to what extent the foreign sovereign participates in negotiations with the U.S. contractor. *See id.* § 225.7304(d) (noting that, as a general matter, "the degree of [foreign government] participation in contract negotiations [with the U.S. contractor] is left to the discretion of the [U.S. government]"). Applicable regulations outline all that is required of the U.S. government in responding to objections of a foreign sovereign to prices demanded by the U.S. contractor. *See id.* § 225.7304(h) ("If [a foreign government] requests additional data concerning FMS contract prices," the U.S. government shall "provide sufficient data to demonstrate the reasonableness of the price," which may include "an explanation of any significant differences between the actual contract price and the estimated contract price included in the initial" government-to-government deal).

Because the U.S. government retains control over price in an FMS transaction, a foreign state generally has no cause of action — against anyone — if the price demanded

23

by the U.S. government increases over time. If a foreign state does not wish to abide by this limitation, it need not, and should not, enter into an FMS transaction.[11]

Moreover, enforcement of the BAE-Korea agreement here would subvert the FMS structure and congressional directives as to all FMS transactions. It would provide a foreign state with a cause of action against a U.S. contractor if the price of the FMS transaction exceeded initial expectations, because the foreign state could always claim the U.S. contractor did not use its best efforts to keep prices down. Thus, although enforcement of the BAE-Korea agreement as Korea seeks would not "control" the FMS transaction price in a strict sense (*i.e.*, it would not dictate what the U.S. government ultimately charges Korea, nor would it dictate what BAE charges the U.S. government), it would nevertheless allow a foreign state to recover from a U.S. contractor if the cost of the FMS transaction exceeded initial estimates. Accordingly, it would import a benefit available only in a direct purchase, DCS transaction, into an FMS transaction. In a DCS transaction, the foreign state may negotiate a fixed price with the U.S. contractor, such

---

[11] We are also unpersuaded by Korea's argument that the BAE-Korea agreement is akin to an offset arrangement and is thus enforceable. In an FMS transaction, the foreign state and U.S. contractor may negotiate offsets, which are "the entire range of industrial and commercial benefits provided [by contractors] to foreign governments as an inducement or condition to purchase military supplies or services." DFARS Procedures, Guidance, and Information 225.7303-2 (May 2015), https://www.acq.osd.mil/DPAP/dars/dfarspgi/current/index.html (last visited March 5, 2018). Korea claims that offsets are enforceable and that the BAE-Korea agreement is "*similar* to an offset agreement" in that it is "an ancillary contract between the foreign purchaser and the contractor related to an FMS transaction." Appellant's Opening Br. 52 n.10. Even if offsets are enforceable, we view them as distinct. Offsets, unlike the BAE-Korea agreement, do not undermine the FMS structure. Instead, offsets are mere inducements offered by U.S. contractors to the foreign state to convince the foreign state to purchase military goods and services in the first place.

that it knows how much money it will owe. In an FMS transaction, by contrast, a foreign government that objects to price increases may only consult with the U.S. government or withdraw from the transaction.

C.

In its Amicus brief — which supported neither party on the issue of whether the BAE-Korea agreement is enforceable — the United States suggests that "Korea is not seeking to reorder the FMS statutory structure." Br. for the United States as Amicus Curiae at 6. Partly for that reason, it concludes that national security concerns "do not prohibit enforcement of the [best efforts] provision at issue here." *Id.* at 1–2, 6.[12]

As an initial matter, the Government's mere assertion that "Korea is not seeking to reorder the FMS statutory structure" is overly simplistic. Under *Trimble*, we focus on whether enforcement of the BAE-Korea agreement would undermine the FMS structure established by Congress. The Government's brief does not meaningfully engage with this issue: it fails to even mention the statute authorizing FMS transactions (AECA), the

---

[12] The United States did not participate in this case in the district court or in the oral argument or original briefing in this court. However, after oral argument, we invited the Government to provide a brief setting forth its views on two questions. First, we asked the Government to address an issue in Korea's appeal (Fourth Circuit No. 17-1041): whether, in the Government's view, permitting Korea to enforce its agreement with BAE would "run counter to United States national security interests." Second, we solicited the Government's view on the issue pursued by BAE in its cross-appeal (Fourth Circuit No. 17-1070): whether a permanent anti-suit injunction "is warranted in light of any United States national security interests."

regulations governing such transactions (DFARS), the key manual with which FMS transactions must comply (SAMM), or the standard terms used in FMS agreements.[13]

The Government also suggests that enforcement would not undermine the FMS structure, because Korea seeks compensation "only for BAE's own alleged failure to use best efforts," and "is not here reneging on a commitment to settle disputes with the United States using government-to-government negotiation." Amicus Br. at 6. Functionally, however, Korea does precisely this — it seeks to hold BAE liable for higher prices demanded by the United States in the government-to-government negotiation. The record makes this connection plain: one day after the U.S. government announced a price increase, Korea demanded payment from BAE.

Finally, although we take seriously the Government's views, we note that the Government in its brief only concludes national security interests do not prohibit enforcement of the "best effort" provision in the particular agreement and circumstances presented here. The same might not be true, the Government suggests, the next time around. *See* Amicus Br. at 1–2, 5 n.2. This provides no guidance to industry actors and suggests that courts must consider the distinct national security implications of each and

---

[13] Instead, the Government's effort to distinguish *Trimble* rests entirely on factual differences between *Trimble* and the case at hand. These factual differences are certainly relevant. But even more important and more relevant here are concerns at the center of the *Trimble* holding that the foreign government's lawsuit runs counter to the statutory and regulatory structure underpinning FMS transactions — something the Government largely fails to address.

every contract that, like the BAE-Korea agreement here, relates to (but is technically separate from) an FMS transaction. That approach is unworkable.[14]

In sum, although we appreciate the Government's assistance, we do not find its reasoning with respect to the enforceability of the "best effort" clause to be persuasive.

V.

Finally, BAE claims the district court erred by failing to impose a permanent anti-suit injunction barring the Korean government from bringing suit in Korea to enforce the BAE-Korea agreement. After the district court granted summary judgment in favor of BAE, it lifted a preliminary injunction it had previously imposed. The court concluded that if South Korea "proceed[ed] with its claims against BAE in its own courts, BAE may defend against the claims by asserting any claim or issue preclusion that this judgment may afford it under Korean law." We review denial of the permanent anti-suit injunction for abuse of discretion. *See Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 939 (4th Cir. 1995).

Although a district court with jurisdiction over the parties may prohibit them from proceeding with a lawsuit in a foreign country, the court should use that power "sparingly." *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 881 (9th Cir. 2012)

---

[14] Moreover, the harm the Government suggests might arise from holding unenforceable "best efforts" clauses like the one at issue here — *i.e.*, "influencing allied countries to look elsewhere for some military purchases," Amicus Br. at 3 — is one Korea never raised in this lengthy litigation involving numerous briefs and oral arguments.

27

(internal quotation marks and citation omitted). Our sister circuits have outlined at least two approaches for determining if a foreign anti-suit injunction is warranted: the "liberal" test and the "conservative" test. Both weigh factors favoring an injunction against the effect of an injunction on international comity.[15] The principal difference is that the liberal approach accords less weight to international comity concerns. *See Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 10 F.3d 425, 431 (7th Cir. 1993). But international comity remains a significant consideration, even in courts endorsing the liberal approach. *See E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 990–91, 994 (9th Cir. 2006) (under the liberal standard, a court must perform a "detailed analysis" to determine whether the impact on international comity would be "tolerable").

In our view, no matter which approach provides the appropriate framework, the district court did not abuse its discretion in denying BAE's petition for a permanent anti-suit injunction. BAE's contention to the contrary rests on two rationales.

First, BAE claims the Korean litigation threatens the district court's jurisdiction, because "the U.S. court system is the proper venue for the dispute," and, absent an injunction, BAE "face[s] the possibility of an inconsistent judgment" in Korea, which "could be enforced in [Korea] or potentially third countries." Appellee/Cross-Appellant's Response/Opening Br. at 40. We agree that a district court may, in certain circumstances, impose an anti-suit injunction to protect its own jurisdiction, even where

---

[15] Under both approaches, the court also examines, as a threshold inquiry, whether the parties and issues in the two disputes are the same. On appeal, neither BAE nor Korea contend that the two disputes are not the same.

(as here) it has already rendered its judgment. In that context, the injunction serves to protect the integrity of the district court order in case the foreign forum fails to give *res judicata* effect to the district court judgment. *See Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 654 (2d Cir. 2004).

But parallel proceedings are common, and an anti-suit injunction is not appropriate every time parallel proceedings may occur and litigation in the U.S. court concludes first. *See Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 928 n.54 (D.C. Cir. 1984) ("[A] showing of harassment, bad faith, or other strong equitable circumstances should ordinarily be required" for a district court to impose an anti-suit injunction in order to protect an existing judgment). Otherwise, such injunctions would be commonplace rather than extraordinary. Here, the Korean litigation is not particularly vexatious or oppressive; indeed, the forum selection clause in the BAE-Korea agreement contemplates (but does not require) litigation in Korea. In sum, we conclude that jurisdictional grounds provide an unconvincing justification for an anti-suit injunction.

BAE also claims an injunction is necessary in order to protect U.S. national security interests. Here, BAE has more solid footing. We have concluded that enforcement of the BAE-Korea agreement runs counter to U.S. national security concerns, and we agree that enforcement by a Korean court may threaten those same concerns. But BAE goes even further, suggesting it would be inconsistent to allow the enforceability of the BAE-Korea agreement to be litigated in Korea after holding, as we do here, that enforcement runs counter to national security interests. *See* Appellee/Cross-Appellant's Response/Opening Br. at 32–33. That line of reasoning is too simplistic,

29

because it ignores international comity concerns that must always be considered in determining whether to issue an anti-suit injunction.

International comity counsels us to give effect, if possible, to the judgments of foreign courts in order to strengthen international cooperation. *See Hilton v. Guyot*, 159 U.S. 113, 163–64 (1895). Here, these comity concerns are near their peak. Even courts following the liberal framework recognize that comity concerns are far greater where an injunction would bar a foreign sovereign (rather than a private party) from litigating a dispute in its own courts. *See Allendale*, 10 F.3d at 428 (suggesting an injunction barring the French government "from litigating a suit on a French insurance policy in a French court" would be "an extraordinary breach of international comity"); *see also Microsoft*, 696 F.3d at 887; *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 627 (5th Cir. 1996). Indeed, an anti-suit injunction here would impinge on the sovereignty of the Korean courts (to hear the case) and the Korean government (to litigate it). And it would do so on a permanent basis, raising even graver comity concerns. Because anti-suit injunctions against foreign sovereigns are so unusual, no circuit precedent (and little out-of-circuit precedent) exists to guide courts in analysis of this issue.

Given all of these circumstances, we can hardly conclude the district court abused its discretion by declining to impose an anti-suit injunction.[16]

---

[16] Our conclusion in this regard is bolstered by the response of the United States as Amicus in this case. In its brief, the Government's answer to our second question was unequivocal — an anti-suit injunction is not warranted. Indeed, the Government urged us not to impose an anti-suit injunction, partly due to international comity concerns.

## VI.

For the foregoing reasons, the judgment of the district court is in all respects

*AFFIRMED*.